**BASLEE PRODUCTS CORP., Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE and Philip O'Donnell, Postmaster, Bayonne, New Jersey, Defendants.**

Civ. A. No. 1469-72.

United States District Court,
D. New Jersey.

March 21, 1973.

842

Herbert J. Stern, U. S. Atty., by Stephen E. King, Asst. U. S. Atty., Newark, N. J., for plaintiff.

Herbert Alterman, Passaic, N. J., Bass & Ullman, New York City, by Robert Ullman, New York City, of counsel, for defendants.

## OPINION

LACEY, District Judge:

██ Plaintiff (hereinafter Baslee) seeks to enjoin defendants' mail stop order, issued under 39 U.S.C. § 3005 on an administrative determination of false advertising. Jurisdiction lies under 39 U.S.C. § 409.[1] Immediately before me are cross motions for summary judgment.

---

1. 39 U.S.C. § 3005 provides:
 False representations; lotteries
 (a) Upon evidence satisfactory to the Postal Service that any person is engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations, or is engaged in conducting a lottery, gift enterprise, or scheme for the distribution of money or of real or personal property, by lottery, chance, or drawing of any kind, the Postal Service may issue an order which—
 (1) directs the postmaster of the post office at which mail arrives, addressed to such a person or to his representative, to return such mail to the sender appropriately marked as in violation of this section, if the person, or his representative, is first notified and given reasonable opportunity to be present at the receiving post office to survey the mail before the postmaster returns the mail to the sender; and
 (2) forbids the payment by a postmaster to the person or his representative of any money order or postal note drawn to the order of either and provides for the return to the remitter of the sum named in the money order or postal note.
 (b) The public advertisement by a person engaged in activities covered by subsection (a) of this section, that remittances may be made by mail to a person named in the advertisement, is prima facie evidence that the latter is the agent or representative of the advertiser for the receipt of remittances on behalf of the advertiser. The Postal Service may ascertain the existence of the agency in any other legal way satisfactory to it.
 (c) As used in this section and section 3006 of this title, the term "representative" includes an agent or representative acting as an individual or as a firm, bank, corporation, or association of any kind.
 This relatively new statute is part of the Postal Reorganization Act, Pub.L. 91–375, § 2, August 12, 1970, 84 Stat. 747 which, among other things, created the United States Postal Service to which all the functions, powers, and duties of the Post Office Department and the Postmaster General of the Post Office Department were assigned, and abolished the Post Office Department and the office of the Postmaster General. Sec. 3005 is the "fraudulent advertising" replacement for 39 U.S.C. § 4005, and, accordingly, I have relied in this opinion to a degree on case law construing § 4005.
 39 U.S.C. § 409 provides:
 Suits by and against the Postal Service
 (a) Except as provided in section 3628 of this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service. Any action brought in a State court to which the Postal Service is a party may be removed to the appropriate United States district court under the provisions of chapter 89 of title 28.
 (b) Unless otherwise provided in this title, the provisions of title 28 relating to service of process, venue, and limitations of time for bringing action in suits in which the United States, its officers, or employees are parties, and the rules of procedure adopted under title 28 for suits in which the United States, its officers, or employees are parties, shall apply in like manner to suits in which the Postal Service, its officers, or employees are parties.
 (c) The provisions of chapter 171 and all other provisions of title 28 relating to tort claims shall apply to tort claims arising out of activities of the Postal Service.
 (d) The Department of Justice shall furnish, under section 411 of this title, the Postal Service such legal representation as it may require, but with the prior consent of the Attorney General the Postal Service may employ attorneys by contract or otherwise to conduct litigation brought by or against the Postal Service or its officers or employees in matters affecting the Postal Service.
 That judicial review of this administrative determination may be had by way of suit for an injunction is clear. 5 U.S.C. § 703. *See also* Rettinger v. F. T. C., 392 F.2d 454 (2d Cir. 1968).

## BACKGROUND

Defendants (hereinafter Postal Service) filed an administrative complaint against Baslee on June 8, 1972, charging it was obtaining monies through the United States mails by false representations in violation of 39 U.S.C. § 3005.

Pending final determination of the administrative proceeding, the Postal Service, pursuant to 39 U.S.C. § 3007, obtained from this Court a preliminary injunction directing the interim detention by the Postal Service of Baslee's mail.[2]

Baslee answered the administrative complaint by denying the charges. A trial-type hearing was held at the United States Postal Service in Washington, D. C. before a Judicial Officer, who, in his decision and order, sustained the departmental complaint as to nine of the ten misrepresentations allegedly made by Baslee.[3]

Baslee now seeks in this Court to enjoin the enforcement of that administrative order, claiming that:

1. Material error was committed by the Judicial Officer in refusing to consider and give weight to Baslee's expert testimony;

2. Substantial evidence is lacking in the record of material false representation;

3. The scope of the Judicial Officer's order is unreasonable and unnecessarily broad.

## SCOPE OF REVIEW

■ Judicial review of the Judicial Officer's decision is limited to determining whether there is, considering the record as a whole, substantial evidence to support his findings of fact, and whether he has committed errors of law. 5 U.S.C. § 706 (1970); Consolo v. Federal Maritime Commission, 383 U.S. 607, 618–621 (1966); NLRB v. Brown, 380 U.S. 278, 291–292, 85 S.Ct. 980, 13 L. Ed.2d 839 (1965); Universal Camera Corp. v. NLRB, 340 U.S. 474, 496–497, 71 S.Ct. 456, 95 L.Ed. 456 (1951); 4 K. Davis, Administrative Law Treatise § 29.01, at 114 (1958). *Cf.* Stein's v. Pilling, 256 F.Supp. 238 (D.N.J.1966), aff'd per curiam, 379 F.2d 554 (3d Cir. 1967); Pinkus v. Reilly, 71 F.Supp. 993 (D.N.J.1947), aff'd, 170 F.2d 786 (3d Cir. 1948), aff'd, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63 (1949).

■ Moreover, in examining the record below to determine whether there is the requisite supportive evidence, this Court must, in evaluating the advertisement in issue, determine its effect as a whole upon the ordinary mind of the general public. Donaldson v. Read Magazine, Inc., 333 U.S. 178, 189, 68 S.Ct. 591, 92 L.Ed. 628 (1948). *See also* Spiegel, Inc. v. F. T. C., 411 F.2d 481, 483 (7th Cir. 1969), where the court stated that "the meaning and 'impression upon the mind of the reader arises from the sum total of not only what is said but also of all that is reasonably

2. 39 U.S.C. § 3007 provides:
 Detention of mail for temporary periods
 (a) In preparation for or during the pendency of proceedings under sections 3005 and 3006 of this title, the United States district court in the district in which the defendant receives his mail shall, upon application therefor by the Postal Service and upon a showing of probable cause to believe either section is being violated, enter a temporary restraining order and preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure directing the detention of the defendant's incoming mail by the postmaster pending the conclusion of the statutory proceedings and any appeal there-

from. The district court may provide in the order that the detained mail be open to examination by the defendant and such mail be delivered as is clearly not connected with the alleged unlawful activity. An action taken by a court hereunder does not affect or determine any fact at issue in the statutory proceedings.
 (b) This section does not apply to mail addressed to publishers of newspapers and other periodical publications entitled to a periodical publication rate or to mail addressed to the agents of those publishers.

3. Not sustained was "specification f" concerning the Department of Agriculture. *See* fn. 4, *infra.*

implied.' " In United States Retail Credit Association, Inc. v. F. T. C., 300 F.2d 212, 219 (4th Cir. 1962), it was stated:

> In adjudging the falsity of advertising representations, regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which such representations might reasonably be expected to have upon the general public.

*See also* Colgate-Palmolive Company v. F. T. C., 310 F.2d 89, 91 (1st Cir. 1962): " . . . advertisements are not judged by scholarly dissection in a college classroom."

## THE ADMINISTRATIVE RECORD

The advertisement at issue is set out in full at the conclusion of this opinion as Appendix I.

The Postal Service complaint charged that Baslee's violations of 39 U.S.C. § 3005 were as specified in ten false representations allegedly made in the advertisement [Complaint, paras. 3(a)–(j)]. The Judicial Officer's opinion set forth these representations or specifications, accompanying each with what he deemed appropriate and supportive excerpts from the advertising.[4]

4. *See* Judicial Officer's Opinion, pp. 4–8: *Specification a.*: " 'The Marvex Plan' is a scientifically sound and effective remedy for obesity."
Advertisement: "Remember this method of weight loss is Tested and Proven and is currently being used by a LEADING NEW YORK INTERNIST on his overweight patients. And it was originally discovered by the United States Department of Agriculture, so you are not experimenting with a new gimmick or theory."
"Keep in mind that the MARVEX PLAN is safe, effective and simple, and best of all, really works to get rid of that fat and keep it off."
*Specification b.*: " 'The Marvex Plan' will overcome, treat and cure obesity while permitting the obese person to eat all the fattening foods he may desire."
Advertisement: "I ate all the Fried Chicken, Fatty meats, Unlimited Amounts of Oil, Cheese, Butter * * * Until I was so full I couldn't move * * * and just about Every High Calorie Food and as much as I wanted."
" * * * actually stuffing myself I lost as much weight as I wanted".
*Specification c.*: "An obese person may accomplish losses of weight more quickly by consuming increased quantities of fattening foods while adhering to 'The Marvex Plan'."
Advertisement: "THE MORE HIGH CALORIE FATTENING FOODS YOU CONSUME THE FASTER YOU LOSE WEIGHT! "
"The more fattening foods you eat the faster the weight disappears."
*Specification d.*: " 'The Marvex Plan' is safe for use by all persons in normal health."
Advertisement: "If you are in normal health and Want To Lose Pounds And Inches of Unwanted Ugly Fat that's ruining your appearance and shortening your life . . . well here at last is your opportunity! "
"Keep in mind that the MARVEX PLAN is safe, effective and simple".
*Specification e.*: "Through adherence to the 'Marvex Plan' an obese person may lose as much weight as he desires within any period of time he may select."
Advertisement: " * * * with this method of actually stuffing myself I lost as much weight as I wanted".
"You must lose as much weight as you want and keep it off! "
*Mail Order Coupon*:
"PLEASE FILL IN THE ENCLOSED CHART AS TO THE AMOUNTS OF WEIGHT AND HOW QUICKLY YOU WOULD LIKE TO LOSE IT!
———— I would like to lose pounds in 5 days.
———— I would like to lose pounds in 10 days.
———— I would like to lose pounds in 15 days.
———— I would like to lose pounds in 20 days.
———— I would like to lose pounds in 25 days.
———— I would like to lose pounds in 30 days."
*Specification f.*: " 'The Marvex Plan' was developed and approved by the United States Department of Agriculture."
Advertisement: "THE UNITED STATES DEPARTMENT OF AGRICULTURE HAS PUBLISHED ALL THE INFORMATION YOU NEED".
"And it was originally discovered by the United States Department of Agriculture, so you are not experimenting with a new gimmick or theory."

The Judicial Officer then found that all representations but that in specification f had been made in the subject advertisement, and that these were false. He then concluded that Baslee "is engaged in conducting a scheme or device for obtaining money through the mail by means of false representations within the meaning of 39 U.S.C. 3005." The parties are in accord in interpreting this determination as being applicable to all of the specified representations (except, of course, specification f).

*The Representations Charged*

■ Baslee challenges the Postal Service procedure of setting out, in the several specifications, the meaning (as inferred by the Postal Service) to be drawn from various portions of the advertisement. Rather, states Baslee, only the precise words used should be determinative of truth or falsity. Baslee further contends that the Postal Service has unfairly distorted the true meaning

of the words used in the advertisement. Its position, as thus stated, requires analysis of each of the specifications of falsity.

The first false representation charged was in specification a. It provides as follows: " 'The Marvex Plan' is a scientifically sound and effective remedy for obesity."

The Judicial Officer found supportive language for this "summing-up" in the following language of the advertisement:

Remember this method of weight loss is Tested and Proven and is currently being used by a LEADING NEW YORK INTERNIST on his overweight patients. And it was originally discovered by the United States Department of Agriculture, so you are not experimenting with a new gimmick or theory.

\*　　\*　　\*　　\*　　\*　　\*

Keep in mind that the MARVEX PLAN is safe, effective and simple,

*Specification g.:* " 'The Marvex Plan' will effectively overcome, treat and cure obesity in every instance."
Advertisement: "THIS AMAZING METHOD WORKED ON 100% OF ALL CASES TESTED !! "
"I GUARANTEE RESULTS IN THE FIRST 5 DAYS OR MY MARVEX PLAN WILL COST YOU NOTHING ! "
"You must lose as much weight as you want and keep it off ! "
"I understand that if I do not lose pounds and inches after following your 'MARVEX' Method . . . I am entitled to a refund of the complete purchase price."
*Specification h.:* " 'The Marvex Plan' does not require an obese person to limit the variety of foods which he may consume."
Advertisement: "I ate all the Fried Chicken, Fatty meats, Unlimited Amounts of Oil, Cheese, Butter . . . Drank Martinis, all the Scotch or Rye liquors I wanted—Drank Heavy Cream, Sour Cream, Mayonnaise, Hollandaise Sauce . . . Until I was so full I couldn't move. All the Eggs I wanted, Chicken Livers, all the Shrimp and Bacon, Pork, Fatty Meats . . . and just about Every High Calorie Food and as much as I wanted."
"Just eat all you want of those Delicious Fattening Foods and watch the miracle take place."

"NOW YOU DO NOT NEED TO USE SELF CONTROL AT ALL WITH THIS METHOD".
*Specification i.:* " 'The Marvex Plan' has been scientifically tested and proven as a safe, effective and permanent remedy for obesity."
Advertisement: "Remember this method of weight loss is Tested and Proven and is currently being used by a LEADING NEW YORK INTERNIST on his overweight patients. And it was originally discovered by the United States Department of Agriculture, so you are not experimenting with a new gimmick or theory."
"Keep in mind that the MARVEX PLAN is safe, effective and simple, and best of all, really works to get rid of that fat and keep it off."
*Specification j.:* " 'The Marvex Tablet' plays a significant part in the accomplishment of a reduction of body weight and size."
Advertisement: "Here's all you do: Take *only* 1 MARVEX tablet daily with your breakfast following the enclosed method . . . and just watch the fat literally fall away. That's correct, no swallowing of 3 or 4 pills a day. Just take 1 tablet with this plan and your own body does the work for you."
"Enclosed is my payment in full for your wonderful 'MARVEX' Formula."

and best of all, really works to get rid of that fat and keep it off.

Baslee, in attacking this specification, states it had never represented that its Marvex Plan was a "remedy" or "permanent remedy" for obesity, while conceding that it "did represent that the Marvex Plan is a scientifically safe and effective method for losing weight without emphasis on caloric intake." (Plaintiff's Brief, pp. 16, 17).

The Oxford Universal Dictionary (rev. 1955) has the following pertinent definitions:

> Remedy . . . 1. A cure for a disease or other disorder of body or mind; any medicine or treatment which alleviates pain and promotes restoration to health. 2. A means of counteracting or removing an outward evil of any kind; . . .

The same authority defines "Obesity" as "The condition of being obese; corpulence" and "Obese" is defined as "Very fat or fleshy; corpulent."

■ Given Baslee's concession, I perceive no valid distinction of substance between what plaintiff concedes its advertisement was addressed to, that is, a "method for losing weight," and the specification's language, "remedy for obesity," judged against the overall background of the advertisement's total language and pictorial display of a very fat woman who claims to have "Lost 69 lbs. of Ugly Fat . . . In Only 30 Days!!!" Indeed, plaintiff's expert was, on direct examination, given this question:

> Dr. Fredericks, in your opinion, is the Marvex Plan a sound method to permit an *obese* individual to lose weight while eating all the fattening foods? . . . [emphasis supplied]
> The Witness: The answer is yes. (Tr. 217)[5]

■ As to Baslee's contention that it "makes no claim for treatments and cures!" (Plaintiff's Brief, p. 24), the language of the advertisement, fairly read, does just that: ". . . this method of weight loss is Tested and Proven and is currently being used by a LEADING NEW YORK INTERNIST on his overweight patients."; "You must lose as much weight as you want and keep it off!"; "THIS AMAZING METHOD WORKED ON 100% OF ALL CASES TESTED!!"; "'MARVEX' Formula"; "Take *only* 1 MARVEX tablet daily with your breakfast following the enclosed method . . . and just watch the fat literally fall away. That's correct, no swallowing of 3 or 4 pills a day. Just take 1 tablet with this plan and your own body does the work for you." [emphasis in original]

Accordingly, I find that the Judicial Officer properly determined that the representation of specification a was made.

■ I further find that the Postal Service proceeded properly, and according to law, in gathering together from the advertisement various phrases, and their innuendoes and suggestions, embodying them in a sensible and coherent format, and utilizing one test: what is "the meaning and 'impression upon the mind of the reader [that] arises from the sum total of not only what is said but also of all that is reasonably implied[?]'" Spiegel, Inc. v. F. T. C., *supra*, 411 F.2d at 483. After all, as I have already stressed, to hold that the law is otherwise would be to provide immunity to the master of the artful phrase, who was able to convey a subtle but penetrating message by seemingly innocuous but carefully contrived verbalisms.

Baslee also complains that there is nothing in the record to support the proposition "that the impressions produced by plaintiff's advertisement in the minds of ordinary men and women are those alleged in the administrative complaint rather than the ordinary meaning of the words actually used." (Plaintiff's Brief, p. 17). I assume that, by this, Baslee would claim probative testimony was required to establish the Spiegel connection. I know of no such

---

5. The reference is to the Transcript of the Administrative Hearing.

requirement nor does Baslee cite me to any authority supporting this theory of law.

Baslee also attacks specification b, which provides:

'The Marvex Plan' will overcome, treat and cure obesity while permitting the obese person to eat all the fattening foods he may desire.

Clearly this specification reflects the message that Baslee's advertisement intended to convey to the ordinary reader. In addition to the excerpts cited by the Judicial Officer (see footnote 4, specification b), the advertisement, in bold face capital letter type, states: "THE MORE HIGH CALORIE FATTENING FOODS YOU CONSUME THE FASTER YOU LOSE WEIGHT!"

There are three broad categories of foods: protein, fat, and carbohydrates. Baslee's advertising of its Marvex Plan, I find, was obviously worded to convey the idea that its "METHOD" was different because, by taking "1 MARVEX tablet daily with your breakfast," you can, without any restriction in diet, lose all the weight you want. The fact is, however, the "PLAN" itself carries a very definite limitation—on carbohydrates. Yet the advertising clearly states that under the "PLAN" the more "HIGH CALORIE FATTENING FOODS YOU CONSUME THE FASTER YOU LOSE WEIGHT!" It cannot be denied that carbohydrates are "HIGH CALORIE FATTENING FOODS"; but Baslee argues that its advertising really means "Fat" and not "FATTENING," and that the two words are often used interchangeably, citing in support of this the hearing testimony of the Postal Service expert, Dr. McGavack. It is true that Dr. McGavack did use one word when he clearly meant the other, and he then promptly admitted he had erred. In any case, Baslee can hardly rely on such nice distinctions when its entire advertisement emphasizes that every kind of food can be eaten, without restriction.

■ Clearly, therefore, specification b is accurate, and the Judicial Officer properly found the representation therein was made.

The advertisement references made by me in the foregoing paragraphs are also applicable to, and abundantly support, the Judicial Officer's finding that Baslee made the representation found in specification c, which provides:

An obese person may accomplish losses of weight more quickly by consuming increased quantities of fattening foods while adhering to 'The Marvex Plan'.

Next, the Postal Service charged in specification d that Baslee's advertisement was false in representing that "'The Marvex Plan' is safe for use by all persons in normal health." The pertinent advertising language reads: "If you are in normal health and Want To Lose Pounds And Inches of Unwanted Ugly Fat that's ruining your appearance and shortening your life . . . well here at last is your opportunity!" At a widely separated point in the advertisement appear the words "Keep in mind that the MARVEX PLAN is safe, effective and simple, and best of all, really works to get rid of that fat and keep it off." It could well be argued that the draftsman of this language purposely widely separated the two quoted portions and that the claim of safety is really not limited to those users who are "in normal health," but rather applies to all persons, whether or not "in normal health." If anything, therefore, specification d is more than generous to plaintiff. That the Judicial Officer properly found it to be accurate is clear.

Specification e provides:

Through adherence to the 'Marvex Plan' an obese person may lose as much weight as he desires within any period of time he may select.

■ Baslee challenges this specification, stating that the advertisement does not claim that an obese person may lose as much weight as he desires within any selected period of time.

I disagree. The excerpted portions of the advertisement found under specification e in the Judicial Officer's opinion

(*see* footnote 4) solidly establish that the charged representation was made.

I further find the excerpted portions of the advertisement, as embodied in the Judicial Officer's opinion, to be more than substantial evidential support for his findings that specifications g, h, and i, were made by Baslee.

Specification j should be dealt with separately. In it the Postal Service charges Baslee's advertisement as representing that "'The Marvex Tablet' plays a significant part in the accomplishment of a reduction of body weight and size." The advertising supportive of this charged representation consisted of the following excerpts:

> Here's all you do: Take *only* 1 MARVEX tablet daily with your breakfast following the enclosed method . . . and just watch the fat literally fall away. That's correct, no swallowing of 3 or 4 pills a day. Just take 1 tablet with this plan and your own body does the work for you. [Emphasis in original]
>
> \* \* \* \* \* \*
>
> Enclosed is my payment in full for your wonderful "MARVEX" Formula.

The total advertisement emphasizes the role of the tablet. It is necessary to read *all* of the advertisement. It creates an air of mystery. One can eat all the "FATTENING" food he desires, he can "OVEREAT" and yet lose "POUND AFTER POUND," you can "eat all you want of those Delicious Fattening Foods and watch the miracle take place." Then, after what colloquially could be called the "build-up," or the "big sell," comes the language: "Here's all you do: Take *only* 1 MARVEX tablet daily . . . ." etc.

No one can seriously contend that the advertisement does not play up the tablet as a weight reducing agent. The evidence to the contrary is too strong.

And why does it afford to the tablet such significance? There are two reasons. The tablet is a necessary element in the re-order. A customer gets for his first "30 Day Supply of 'MARVEX'" for $5.98 a simple 1-page list of foods that are permitted or forbidden, and the tablets.[6] The document obviously does not require renewal. If the customers were advised that the tablets were *only* a dietary supplement, and not a weight reducing agent, at least one, and probably both, of these reactions would occur. First, he would wonder why, if the diet as advertised was without restriction, he had to supplement it with the tablet. Second, if the diet were as advertised, without restriction on any "Fattening" foods, and the tablet played no role in causing weight loss, he might easily conclude that the claims were without foundation. Thus the use of the tablet in the advertisement enables Baslee to lead the customer to purchase its "PLAN." Once he gets it he will of course be aware that carbohydrates are reduced to a minimum. Even at this point, however, he may believe that the "dietary supplement" is still necessary for weight loss, in view of the advertisement.

I have gone into this detail in reviewing specification j because at the administrative hearing, and in its presentation on this review, Baslee agrees that the tablets are not a weight reducing agent, at the same time denying that its advertisement so claims.

I find first that the Judicial Officer properly held that the advertisement does make the representation contained in specification j. Moreover, in view not only of the record and testimony, but the concession by Baslee's counsel, I further find that there is substantial evidence to uphold the Judicial Officer's finding that the representation was false.

### The Judicial Officer's Finding of Falsity

One non-issue should first be covered. The Postal Service did not and now does not contend against the proposition that

---

6. The "Plan" is reproduced at the end of this opinion as Appendix II and was Ex. CX-4 at the Administrative Hearing. Labels for the dietary supplement bottles were marked at said Hearing as Ex. CX-3 and R-1.

certain diets can result in weight loss, and that a diet in which, as here, carbohydrates are eliminated, or reduced to the very lowest minimum, is one of such diets. Thus, that the Marvex Plan, if scrupulously followed, will cause in some persons a weight loss, is not in dispute.

What is in dispute is whether the advertising of the Marvex Plan, as embodied in the specifications just reviewed, is false in light of what the Plan actually is and does. The Judicial Officer found it was. I find, as hereinafter set forth, that there is substantial evidence in the record as a whole to support that determination.

Turning to the testimony, if one believed the Postal Service expert, Dr. McGavack, an internist, and, where they were in conflict with one another, rejected the testimony of the plaintiff's expert, Dr. Fredericks, a Ph.D. and nutritionist, and accepted Dr. McGavack's, as the Judicial Officer did, there was quite demonstrably substantial evidence to support the Judicial Officer's determination. Moreover, Dr. McGavack's testimony was supported by a Ph.D. and nutritionist, Dr. Paige.

In the clash of experts, credentials and qualifications are generally of some significance, and the Judicial Officer did not act improperly in that regard in this matter.

Dr. McGavack's credentials and qualifications in internal medicine, and, more specifically, in the care, knowledge and treatment of obesity, were imposing, and the Judicial Officer justifiably stated (Opinion, p. 10):

> He [Dr. McGavack] is obviously well qualified to testify concerning the matters involved here. In his practice and in research projects, the witness has had substantial experience in the control of weight in humans including the treatment of obesity.

Giving full weight to all of Dr. McGavack's testimony, the record reflects substantial evidence to support the Judicial Officer's findings. Not only did Dr. McGavack state that each representation as specified was false (Tr. 81–85), but

during both direct and severely intensive cross examination he buttressed his medical opinions as to falsity with medical analysis based upon his training, learning and experience.

In his testimony Dr. McGavack effectively gave the lie to or cast doubt on the credibility of the following claims of the advertisement, all of which were involved, as has been seen, in the Postal Service specifications.

1. That "THIS AMAZING METHOD WORKED ON 100% OF ALL CASES TESTED!!"; and "THIS PLAN IS 100% SUCCESSFUL IN ALL CASES . . . ." (See specification g).

Dr. McGavack disparaged this as virtually a scientific impossibility. Baslee offered no testimony to the contrary.

2. That anyone could lose 69 pounds in 30-days; and, assuming the rare case,

3. That the Plan was safe. (See specifications d and i).

Treating with 2 and 3, Dr. McGavack, after stating that a 69-pound weight loss "would be a very unusual case" with "terrific" cost to the patient, stated:

> Even those who lose much more modestly and come somewhere in reason as to the amount they lose on diets that have some of the design that is present in the Marvex Plan, even those suffer. And some of them end up in a hospital. The follow through on these patients is not happy. . . . (Tr. 59–60)

He also presented a detailed medical analysis on why a "low carbohydrate diet" is unsafe over an extended period (Tr. 52–56), describing particularly its effect on the liver and the circulatory system. He added that the danger in this diet was aggravated for one who was obese.

His medical analysis was not contradicted by Baslee's nutritionist, Dr. Fredericks, the latter simply stating the conclusion that a low carbohydrate diet was safe, and relying on work done by others, including physicians. Had Dr. Fredericks endeavored to go beyond this, and pit his own credentials against Dr. McGavack's in this area, the Judicial Of-

ficer would have acted appropriately in barring this effort, in that Dr. Fredericks was without medical qualifications. The Judicial Officer of course was justified in believing Dr. McGavack on this issue and rejecting Dr. Fredericks' testimony, which was essentially merely conclusory.

Baslee, notwithstanding Dr. McGavack's disparagement of its claim, did not call as a witness the woman in the advertisement who, it is claimed, lost the "69 lbs. of Ugly Fat" in 30-days, nor did it produce records or live testimony to support its claim of 100% effectiveness.

4. That under the Marvex Plan you could eat all the high calorie fattening foods desired. (*See* specifications b, c and h).

I have already dealt with this language of the advertisement. It is clearly untrue. The Judicial Officer could hardly have held otherwise, particularly in view of Baslee having offered only its specious argument that its advertisement should be read to mean all the "fat" foods one can eat.

5. That the tablets have a weight reducing effect. (*See* specification j).

This has hereinabove been covered by me in this opinion. It is a claim that is made, and the Judicial Officer properly held it to be false.

6. That the Marvex Plan is a scientifically sound and effective remedy for obesity. (*See* specification a)

The record reflects substantial evidence to support the Judicial Officer's finding of falsity as to this specification. This is so because a remedy or method (to use Baslee's terms) as unsafe as Dr. McGavack proclaimed it to be is hardly "scientifically sound".

7. That through adherence to the Marvex Plan an obese person may lose as much weight as he desires within any period of time he may select.

Dr. McGavack rejected this (Tr. 84) and Dr. Fredericks did not support it. Indeed, the proposition sinks of its own weight. Of course, the claim would have been given favorable coloring by the tes-

timony of just one satisfied customer, but such was not forthcoming.

The testimony of Dr. Fredericks offered almost no support for any of the advertisement's claims. Essentially he supplied two elements. First, that a low carbohydrate diet would cause weight loss, and second, that such a diet was safe. That it will cause weight loss in some cases is not in dispute. On the other hand, Dr. Fredericks did not claim 100% success for it. As I have already indicated, the safety of the diet is in sharp dispute and the Judicial Officer was well within his rights on this issue in believing Dr. McGavack and rejecting the testimony of Dr. Fredericks.

Apparently because it recognized the disability it labored under in matching a nutritionist against Dr. McGavack, Baslee put into evidence through Dr. Fredericks certain medical articles. To the extent they too indicated a low carbohydrate diet will cause weight loss in a certain number of cases, they were merely cumulative on a point not in dispute.

On the issue of safety, the Judicial Officer was justified in not paying attention to them in the light of Dr. McGavack's testimony. Indeed, Dr. McGavack had certain specific unflattering comments about some of these articles.

Thus, under vigorous and skilled cross examination, Dr. McGavack maintained that "the weight of scientific truth" was that the low carbohydrate diet was injurious (Tr. 125), and then was specifically critical of the Pennington Plan which had been discredited and dropped during the 1950's (Tr. 123, et seq.).

He was caused to address himself to other writings on cross examination as well. His responses were such that the Judicial Officer was justified in regarding his credibility and qualifications as undiminished.

It is further noted, in this Court's review of the said medical articles, that none supported all of the extravagant claims in Baslee's advertisement. Not one, for example, indicated any physi-

cian had ever had, or heard of, a patient who lost 69 pounds in 30 days.

Aside from the Pennington articles, Baslee offered a writing by a general practitioner who stressed, as Dr. Mc-Gavack had done, the necessity for dieting under a physician's care (Ex. R–8); another article dealing with only a limited study, which, while recommending the low carbohydrate diet, regretted it was condemned by most medical authorities in the United States because of what the article's author claimed was a mistaken belief that the diet was not nutritionally sound (Ex. R–7); a writing which proclaimed modestly it dealt with a research project and less than extensive experience (Ex. R–6); and an article which, while reporting weight loss success, did not discuss the issue of safety (Ex. R–4).

Baslee would have me ignore Dr. McGavack's qualifications and credentials, and thereby blunt the forceful thrust of his testimony, by first urging upon me that only a few of his writings dealt with obesity. As I have already stated, it is my opinion that Dr. Mc-Gavack had exceptional qualifications.

▆▆ Next, Baslee claims Dr. Mc-Gavack's testimony was robbed of any probative value because of his concession there were honest differences of opinion in the area of approaches to the treatment of obesity. I find any such concessions no more than the mark of an honest witness, and not as a recession from his opinions given so forcefully throughout direct and cross examination.

Baslee then urges that Dr. McGavack had at first on his direct examination mistakenly characterized the Marvex diet as a "no carbohydrate" diet. Indeed, this was also noted by the Judicial Officer. I attach no more significance to this, however, than did the Judicial Officer. Dr. McGavack's testimony is filled with references to the dangers of a low carbohydrate diet. His testimony concerning the falsity of the Baslee advertising claims is just as relevant to a low carbohydrate diet as to a no carbohydrate diet.

Baslee also charges Dr. McGavack erred in charging that the Marvex diet called for avoidance of all carbohydrates (Plaintiff's Brief, p. 14). It then argues that its diet does not proscribe all carbohydrates. Aside from the *ad hominem* attack on Dr. McGavack, I miss the purpose of the argument. The advertisement explicitly states that all high calorie foods are permitted under the diet. On the other hand, the Marvex Plan stresses that nothing containing sugar should be taken or eaten. Even "diet" foods are proscribed because they "often substitute sugar, lactose or corn syrup instead of fat and these sugar-rish (sic) ingredients are taboo to the MARVEX PLAN." The Plan also admonishes "Avoid all 'diet' breads, candies, fruits, yogurt, dairy substitutes, and sugar containing salad dressings (read labels and select those with lowest carbohydrate content)." The Plan then concludes:

Avoid all sugary and starch loaded cakes, pastry, desserts, and during the first two weeks of using the MARV-EX PLAN avoid potatoes and vegetables, except those used in green salads. Avoid desserts except D-ZERTA Jello and skimmed milk, not because of their "richness" or high calorie content or fat, but because just about all contain sugars.

Yet there is no indication whatever in the advertisement that there is such a limitation on carbohydrates. A fair inference to be drawn from this stark disparity is that it was intended, because to have included such a proscription of carbohydrates in the advertising would have robbed it of impact upon the average reader.

Baslee charges the Judicial Officer erred in not crediting the testimony of Dr. Fredericks.

It is true that the Judicial Officer dealt severely with Dr. Fredericks; however, he stated, with specific transcript references, why he did so, and since he, not I, was in the best position to make a credibility determination, I find no basis for overturning his decision not "to give substantial credit" to

Dr. Fredericks' testimony, particularly since so much of what he said was hearsay derived from certain medical articles and work done by unnamed physicians.

Moreover, as I analyze the record, it is more of theoretical than practical interest that Dr. Fredericks' testimony was rejected in favor of Dr. McGavack's. Their only real clash was on the matter of the safety of à low carbohydrate diet, as I have already demonstrated. Dr. Fredericks did not address himself to the other false advertising, as covered by the Postal Service specifications.[7] Insofar as the capacity of the low carbohydrate diet to cause *some* weight loss in *some* people, Baslee lost nothing in losing the benefit of Dr. Fredericks' testimony, since Dr. McGavack agreed it had this capacity. The important point, however, is that not one specification charges as a misrepresentation that the advertisement made the mere claim that the Marvex Plan would cause *some* weight loss in *some* people under certain circumstances. Indeed had Baslee simply couched its advertisement in such modest terms, there would be no real issue here. It is the excessive and flamboyant language in the advertisement, designed to capture the attention of the unwary, the unsophisticated, and the frustrated, that has framed the instant issues.

 Baslee next argues that the scope of the Judicial Officer's order was unreasonable and too broad. I disagree. The falsity of the advertising is so blatant, and so intertwined throughout the advertisement, as to warrant the drastic relief of the stop order. Anything less would not be in the public interest.

Baslee is in no position to complain. This case, strikingly like another recently decided by me [Institute for Weight Control, Inc. v. Klassen, 348 F.Supp. 1304 (D.N.J.1972), aff'd, 474 F.2d 1338

(3d Cir. 1973)], highlights the proliferation of advertisements of miracle weight loss plans, methods and remedies. Congress obviously saw the danger to the public interest and the need for remedial action. This kind of advertising, offering a quick solution to the often insoluble problem of obesity, plays on fear, pride and vanity. The Postal Service, in argument before me, attempted to put into the record numerous advertisements of extravagant claims which, it contended, were of a pattern with the one before me. I rejected the offer. However, I say this to the Postal Service: Perhaps a broad-scale investigation of these weight loss advertisers, and others, such as bust developer and aphrodisiac advertisers, is long overdue. This is not to say that there are not some companies among them which may include well meaning and well intentioned people. However, I ,cannot remain oblivious to the fact that the classified sections of newspapers and magazines do contain advertising copy that is often so strikingly similar, for example, the depictions of the once obese woman who claims to have lost an incredible number of pounds of "Ugly Fat," as to cause me to wonder what may be behind so much of it.

Returning to the matter at hand, I find that the record, viewed in its entirety, provides substantial evidence and a rational basis for the Judicial Officer's decision as to the making of the charged misrepresentations and their falsity, and that his decision is otherwise in accordance with law. There being no material fact in dispute insofar as the scope of my review is concerned, summary judgment shall be entered in favor of the defendants, United States Postal Service and Phillip O'Donnell, and plaintiff's motion for summary judgment shall be denied, with costs to the defendants. The form of order, to

---

7. Dr. Fredericks said nothing about the Marvex Plan specifically. He said nothing of the Plan's sales, its success or lack of it, or of the basis, if there is a| basis, for Baslee's advertising claims. He failed to touch on the claim of a 69-pound weight loss in 30 days, that the Marvex Plan had been 100% successful, or other such claims. Moreover, his testimony was largely hearsay, as he simply repeated what physicians had written or had uncovered in their research.

be submitted within five days, shall include provision for vacating the preliminary injunction previously entered herein by me by order filed June 26, 1972, so that the defendants are free to proceed pursuant to statute.

APPENDIX I

**THE UNITED STATES DEPARTMENT OF AGRICULTURE HAS PUBLISHED ALL THE INFORMATION YOU NEED TO LOSE AS MUCH EXCESS FAT AS YOU DESIRE!! THIS AMAZING METHOD WORKED ON 100% OF ALL CASES TESTED!!**

# "I Actually Ate 6 Full Meals a Day And Lost 69 lbs. of Ugly Fat... In Only 30 Days!!!"

**YES! 69 POUNDS LOST IN ONLY 1 SINGLE MONTH!! Friends! This is the absolute truth! I ate all the Fried Chicken, Fatty meats, Unlimited Amounts of Oil, Cheese, Butter ... Drank Martinis, all the Scotch or Rye liquors I wanted — Drank Heavy Cream, Sour Cream, Mayonnaise, Hollandaise Sauce ... Until I was so full I couldn't move. All the Eggs I wanted, Chicken Livers, all the Shrimp and Bacon, Pork, Fatty Meats ... and just about Every High Calorie Food and as much as I wanted. Not only did I lose 69 Pounds In Only 30 Short Days But I ate 5 and 6 Times A Day and with this method of actually stuffing myself I lost as much weight as I wanted and best of all, kept it off. That's correct, I stopped after losing 69 pounds and what a difference it made.**

If you are in normal health and Want To Lose Pounds And Inches of Unwanted Ugly Fat that's ruining your appearance and shortening your life...well here at last is your opportunity!

**ACTUALLY OVEREAT AND LOSE POUND AFTER POUND AFTER POUND!**

Now! You can eat *5* and *6 times a day* like you've always wanted to as those Pounds and Inches melt away. It's so unbelievable I thought that perhaps I was sick or needed hospitalization.

**THE MORE HIGH CALORIE FATTENING FOODS YOU CONSUME THE FASTER YOU LOSE WEIGHT!**

THIS PLAN IS 100% SUCCESSFUL IN ALL CASES BUT YOU MUST BE IN NORMAL HEALTH. People like yourself have lost 20-50-90 even 100 pounds and more of weight faster than they ever dreamed possible.

Don't deprive yourself of that figure you've always wanted when now for the first time this wonderful information is available to the general public, and of course, without a doctor's prescription.

Just think, no calories to count. Just eat all you want of those Delicious Fattening Foods and watch the miracle take place.

I call this miraculous discovery the MARVEX PLAN. Yes, the MARVEX PLAN can do the same for you as it has done for thousands upon thousands of people like myself who have deprived themselves of that good, contented full feeling, and never really received the results they were promised with other weight reduction methods.

Here's all you do: Take *only 1* MARVEX tablet daily with your breakfast following the enclosed method ... and just watch the fat liter-

ally fall away. That's correct, no swallowing of 3 or 4 pills a day. Just take 1 tablet with this plan and your own body does the work for you. NOW YOU DO NOT NEED TO USE SELF CONTROL AT ALL WITH THIS METHOD AS 15-35-60-90 POUNDS OR MORE JUST FALL AWAY!

Remember this method of weight loss is Tested and Proven and is currently being used by a LEADING NEW YORK INTERNIST on his overweight patients. And it was originally discovered by the United States Department of Agriculture, so you are not experimenting with a new gimmick or theory.

**I GUARANTEE RESULTS IN THE FIRST 5 DAYS OR MY MARVEX PLAN WILL COST YOU NOTHING!**

Keep in mind that the MARVEX PLAN is safe, effective and simple, and best of all, really works to get rid of that fat and keep it off. Remember you must be completely satisfied by

This is me before using the Marvex Method.

Here I am 30 days Later, 69 lbs. Lighter.

the first five days or your FULL PURCHASE PRICE will be refunded immediately. Send for your MARVEX Today! You'll be glad you did!

**READ THIS GUARANTEE CAREFULLY:**

1. Pounds will disappear the first 5 days!

2. The more fattening foods you eat the faster the weight disappears.

3. You must feel full and contented always!

4. You can eat 5 and 6 meals a day!

5. You must lose as much weight as you want and keep it off!

**SHIPPED IN A PLAIN WRAPPER NO ONE WILL KNOW YOUR SECRET!!**

PLEASE FILL IN THE ENCLOSED CHART AS TO THE AMOUNTS OF WEIGHT AND HOW QUICKLY YOU WOULD LIKE TO LOSE IT!

_____ I would like to lose pounds in 5 days.
_____ I would like to lose pounds in 10 days.
_____ I would like to lose pounds in 15 days.
_____ I would like to lose pounds in 20 days.
_____ I would like to lose pounds in 25 days.
_____ I would like to lose pounds in 30 days.

**BASLEE PRODUCTS CORP., Dept. 214**
618 Broadway, Bayonne, New Jersey 07002

Gentlemen: Enclosed is my payment in full for your wonderful "MARVEX" Formula. I understand that if I do not lose pounds and inches after following your "MARVEX" Method ... I am entitled to a refund of the complete purchase price.

Enclosed is: ☐ cash ☐ check ☐ Money Order
☐ 30 Day Supply of "MARVEX" only $ 5.98
☐ 60 Day Supply of "MARVEX" only $10.00 (Save $2.00)
☐ 90 Day Supply of "MARVEX" only $15.00 (Save $3.00)
☐ 120 Day Supply of "MARVEX" only $20.00 (Save $4.00)

Name_____
Address_____
City_____ State_____ Zip_____
SORRY, No C.O.D.'s Sorry, We Do Not Ship Canadian Orders

APPENDIX II

MARVEX PLAN

TO BE USED IN ASSOCIATION WITH
ENCLOSED MARVEX TABLETS

The MARVEX PLAN is intended for persons in normal
health who are not on special medication. You will
note that there is no need for starvation dieting
or ever going hungry on this plan since you may eat
whenever hungry. There are no fat intake restric-
tions and calories are not to be counted.

EAT THE FOLLOWING FOODS

MEAT
EGGS
FISH
CHICKEN

 Eat as much as you wish of the above,
and broil in butter if desired.

CHEESES: Swiss, Farmer, cheddar, mozzarella,
pot (4 oz.)

HEAVY CREAM: 5-6 teaspoons daily in coffee.

FLAVORINGS: As much as you like of flavor ex-
tracts which contain no sugar.

SPICES: Salt, pepper, mustard, vinegar,
horseradish, garlic salt, or any
other spice which does not contain
sugar. Eat as much as you like. In
salads use mayonnaise instead of
cocktail sauce.

GREEN SALADS: (2 cupfulls) with Italian dressing
of oil, vinegar and spices.

BEVERAGES: As much as you like of sodas which
contain no sugar (Fresca, Tab, etc.)

GELATINS: D-ZERTA Jello is fine for snacks
(contains no sugar).

AVOID "DIET" FOODS AND THE FOLLOWING

Skimmed milk, "diet" ice cream and ice milk should
be avoided. Instead, drink coffee with heavy cream,
since the so-called "diet" foods often substitute
sugar, lactose or corn syrup instead of fat and
these sugar-rish ingredients are taboo to the
MARVEX PLAN.

You must avoid <u>all</u> sugar and sugar-containing foods.
This is not a hardship since there are many sugar
substitutes available.

Avoid all "diet" breads, candies, fruits, yogurt,
dairy substitutes, and sugar containing salad dress-
ings (read labels and select those with lowest car-
bohydrate content).

Avoid catsup and relish.

Avoid foods that contain fillers of the starch
group, such as meat balls, meat loaf, sausage,
salami - also pickled fish.

Avoid all sugary and starch loaded cakes, pastry,
desserts, and during the first two weeks of using
the MARVEX PLAN avoid potatoes and vegetables, ex-
cept those used in green salads.

Avoid desserts except D-ZERTA Jello and skimmed
milk, not because of their "richness" or high
calorie content or fat, but because just about all
contain sugars.