**Vincent LYNCH, d/b/a Brewster Products, Plaintiff,**

v.

**Winton M. BLOUNT, Postmaster General of the United States, and United States of America, Defendants.**

**No. 71 Civ. 1564.**

United States District Court, S. D. New York.

Aug. 16, 1971.

Bass & Ullman, New York City, for plaintiff; Milton Bass, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York, New York City, for defendants; Gerald A. Rosenberg, Alan B. Morrison, Asst. U. S. Attys., Southern District of New York, New York City, of counsel.

Before MEDINA, Senior Circuit Judge, and METZNER and McLEAN, District Judges.

MEDINA, Senior Circuit Judge:

In this action Vincent Lynch prays for an adjudication that 39 U.S.C. Section 3005 is unconstitutional on its face and as applied to plaintiff in an administrative proceeding initiated by the Postmaster General of the United States. In this proceeding the Postmaster General seeks to obtain a stop order in connection with what is claimed to be a scheme to defraud the public by mailing large quantities of printed matter advertising a worthless so-called "Formula 11" as a miraculous way of "draining off fat" in a few days. The complaint requests a temporary and permanent injunction against these administrative proceedings and against the issuance of a stop order. A three-judge District Court was properly convened, and Judge Metzner has already denied a stay of the administrative proceedings which are now in progress.[1] Plaintiff asserts that 39 U.S.C. Section 3005[2] vio-

---

1. Lynch v. Blount, 71 Civ. 1564 (S.D. N.Y. April 16, 1971).

2. This section, which was renumbered from 39 U.S.C. Section 4005 by the Postal

lates the Due Process Clause of the Fifth Amendment and also the Freedom of Speech provision of the First Amendment.

## I

Section 3005 provides that the Postmaster General,[3] after finding that a mailer is engaged in conducting a scheme for obtaining money by means of false representations, may stop the incoming mail of such a person and return it to the sender, by issuing what is known as a stop order. The Postmaster General may also forbid the payment of any money order or postal note made out to such a person and return the money. But under the relevant Postal Service Regulations, 39 C.F.R. Part 952 (1971), a stop order of this kind cannot issue until either a default by the respondent to an administrative complaint or a decision after a hearing on the matter before a civil service hearing examiner. In addition, the decision of the hearing examiner may be stayed pending an administrative appeal to a civil service judicial officer. The entire procedure normally requires about 90 days to complete.

Lynch, doing business as Brewster Products, rented a Post Office box at the Madison Square Station in New York City in the late fall of 1970 and then began an intensive advertising campaign which included the use of the mails, offering Formula 11 as a weight-reducing product to the public for sale. The advertising circular Lynch mailed highly praised the effectiveness of Formula 11 as a weight-reducing aid and asked the recipient to purchase the capsules by returning cash, a check or a postal money order to the plaintiff's Post Office box. The mailings for Formula 11 were very extensive, with over 97,000 circulars being sent out in a two-day period in early April of 1971.

On March 11, 1971 the Postmaster General docketed an administrative complaint against plaintiff, thereby starting the administrative process that determines if a stop order should be imposed on mail addressed to plaintiff. In the Matter of the Complaint Against Brewster Products, P.O.D.No. 3/79. The complaint was served on Lynch on March 17, 1971.

In the complaint the Postmaster General claimed that the advertisement for Formula 11 contained several material false representations, including: (1) although the circular stated that Formula 11 users could "break every 'rule in the book' and still * * * lose seven pounds in the first 48 hours * * * 12 pounds in the very first week * * * 34 pounds the very first month

Reorganization Act of 1970, 84 Stat. 747 (1970), reads in relevant part:

(a) Upon evidence satisfactory to the Postal Service that any person is engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations, * * * the Postal Service may issue an order which—

(1) directs the postmaster of the post office at which mail arrives, addressed to such a person or to his representative, to return such mail to the sender appropriately marked as in violation of this section, if the person, or his representative, is first notified and given reasonable opportunity to be present at the receiving post office to survey the mail before the postmaster returns the mail to the sender; and

(2) forbids the payment by a postmaster to the person or his representa-

tive of any money order or postal note drawn to the order of either and provides for the return to the remitter of the sum named in the money order or postal note.

In addition, under 39 U.S.C. Section 3007 the Postal Service can also apply to a district court for a temporary restraining order and a preliminary injunction, which requires the showing of probable cause of a violation of the statute to issue, directing that the person's mail be detained pending the outcome of the administrative proceedings. However, this latter sanction was not employed against Lynch.

3. The Post Office Department became the Postal Service on July 1, 1971 under the provisions of the Postal Reorganization Act of 1970, 84 Stat. 747 (1970).

\* \* \* Yes lose up to 71 pounds in less than three months' time!'', the Postmaster General claimed that a person using Formula 11 would not lose weight at all if he did not restrict his calorie intake below the level required to maintain his present body weight, and the user of Formula 11 could not lose the specified amounts of weight in the stated time periods; (2) although the advertisements claimed that Formula 11 is "the method that is actually used by doctors themselves when they want to lose weight,'' the Postmaster General alleged that medical doctors do not regard it as a sound weight-reducing medication; and (3) although the circular stated that Formula 11 will "liquify and draw away any existing fat'' and will keep the fat off "permanently,'' the Postmaster General claimed that the capsules do not alter the metabolism of the user and do not permanently cure obesity.

After the complaint was filed, Lynch had until April 9 to answer and a hearing was scheduled for April 21. On April 7, 1971, Lynch filed a complaint in this Court, asking for a declaratory judgment on the constitutionality of Section 3005 and for injunctive relief against its enforcement by the defendant. The next day Judge Metzner issued an order to the Postmaster General to show cause why a three-judge court should not be convened and further granted a temporary restraining order staying the administrative proceedings. In the application to convene a three-judge court pursuant to 28 U.S.C. Section 2282, plaintiff only asked the Court to issue a preliminary and permanent injunction restraining the enforcement of Section 3005 against him. That is the only issue before this Court.

In his opinion of April 16, 1971 convening the three-judge court, Judge Metzner found no irreparable injury would occur to Lynch and dissolved the stay, ordering the administrative proceedings to continue, but he enjoined the enforcement of any stop order which might issue against plaintiff until the constitutionality of the statute had been determined. Lynch then entered a general denial to the administrative complaint and a hearing was held on May 24 in Washington, D. C. Proposed findings of fact were to be submitted to the civil service hearing examiner by June 21. As of now, there has been no administrative decision in this case, and a final decision will probably not be entered until September, 1971. No stop order can be imposed against plaintiff until that time, assuming that the administrative decision is in favor of the Postmaster General, and in the meantime Lynch is free to continue the mailings on Formula 11.

The power of the Congress to pass legislation authorizing the Post Office Department to investigate commercial frauds and to issue stop orders, without prior judicial adjudication, after proper findings describing the scheme to defraud the public, has frequently been upheld by the Supreme Court in cases where resort has been made to a great variety of supposed constitutional infirmities in the underlying statute, including alleged violations of Freedom of Speech requirements. Donaldson v. Read Magazine, 333 U.S. 178, 68 S.Ct. 591, 92 L.Ed. 628 (1948); Public Clearing House v. Coyne, 194 U.S. 497, 24 S. Ct. 789, 48 L.Ed. 1092 (1904).

But plaintiff relies on two subsequent decisions of the Supreme Court. Thus it is said that the effect of Reilly v. Pinkus, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63 (1949), in the light of the 1968 amendment of the basic statute,[4] is to make the amended statute void. The reasoning is that the law now plainly permits a stop order to issue without proof of scienter or intent to defraud,

4. Congress deleted the words "false or fraudulent pretenses, representations, or promises," which had been interpreted to require proof of an intent to deceive in Reilly v. Pinkus, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63 (1949), and inserted in their place "false representations," with no requirement of a finding of scienter needed for the stop order to issue. 82 Stat. 1153 (1968).

and this is said to authorize a taking of property without due process of law. Plaintiff's other point is that the situation here is identical with that of the obscenity stop order in Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971), which dealt with 39 U.S.C. Sections 3006 and 3007, and that the anti-fraud statute must be held to violate the First Amendment because it does not provide for a prior judicial adjudication and does not require the Government to take the initiative promptly in a proceeding in which the Government has the burden of proof.

## II

It is a sufficient answer to the first point, we think, to say that the courts have upheld many other laws passed by the Congress, such as Section 5 of the Securities Act of 1933, 15 U.S.C. Section 77e, and Section 12 of the amended Federal Trade Commission Act, 15 U.S.C. Section 52, to protect people against fraudulent use of the mails, even if the false statements are made without scienter.[5] The purpose of these laws is not to punish the offender but to protect the public. The Post Office Department strongly supported the 1968 amendment for the very purpose of making it less difficult to put an end to these swindles. We think that was a worthy purpose. If, in a given case such as the one now before us, the selling of some particular nostrum is the sole business in which plaintiff is engaged and the stop order will put him out of business, so much the better, if the proofs substantially support the finding that the false statements were made as part of a scheme to defraud.

This is not to say that stop orders will be upheld by the courts whenever a person has resorted to a little exaggeration or mere puffing. The false statement must be material and it must be substantial to warrant the imposition of this drastic remedy.

Reilly v. Pinkus, *supra*, did no more than construe the statute, as it read before the 1968 amendment, as requiring proof of scienter. The case has no constitutional overtones so far as we can see. The legislative history makes it abundantly plain that the amendment was designed to overrule that holding.[6]

---

5. Section 5 of the Securities Act of 1933, 15 U.S.C. Section 77e, makes it unlawful to sell or transmit an unregistered security or prospectus by means of instruments of transportation or communication in interstate commerce or through the mails. Specific intent or scienter is not a necessary element of this crime. United States v. Hill, 298 F.Supp. 1221 (D. Conn.1969) ; United States v. Custer Channel Wing Corp., 247 F.Supp. 481 (D.Md.1965), aff'd, 376 F.2d 675 (4th Cir.), cert. denied, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967). The courts have held that Congress has the power to make such actions illegal under both the Commerce Clause and the Postal Clause of the Constitution. United States v. Wolfson, 405 F.2d 779 (2d Cir. 1968), cert. denied, 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969) ; Archer v. SEC, 133 F.2d 795 (8th Cir.), cert. denied, 319 U.S. 767, 63 S.Ct. 1330, 87 L.Ed. 1717 (1943) ; Oklahoma-Texas Trust v. SEC, 100 F.2d 888, (10th Cir. 1939) ; SEC v. Crude Oil Corp. of America, 93 F.2d 844 (7th Cir. 1937).

Under Section 12 of the amended Federal Trade Commission Act, 15 U.S.C. Section 52, it is unlawful to disseminate false advertisements through the mails or by other means to induce the purchase of food, drugs, devices or cosmetics. Here again specific intent to defraud is not an element that need be proven before the issuance of a cease and desist order. Mueller v. United States, 262 F.2d 443 (5th Cir. 1958). The power vested in the Federal Trade Commission under this section has withstood constitutional attack in several cases, including E.F. Drew & Co. v. FTC, 235 F.2d 735 (2d Cir. 1956), cert. denied, 352 U.S. 969, 77 S.Ct. 360, 1 L.Ed.2d 323 (1957) and American Medicinal Products v. FTC, 136 F.2d 426 (9th Cir. 1943), which cases held that the advertisers had no constitutional right to disseminate false or misleading advertising and Congress therefore had the power to prohibit such conduct.

6. See H.R.Rep. No. 235, 90th Cong., 1st Sess. (1967) ; Hearings on H.R. 1411 Before the Subcommittee on Postal Operations of the House Committee on Post

### III

■ The guaranty of Freedom of Speech is our most precious heritage. It applies to a wide spectrum of human affairs. Nothing could be further from our intention than to weaken or erode the force and effect of this part of the Bill of Rights. Moreover, it is now beyond doubt that the use of the mails is protected by the First Amendment, Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). But it is also clear that the First Amendment right to freedom of speech does not go so far as to grant a person a privilege to mislead the public by means of false commercial advertising, Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). The question for us thus narrows down to whether the process of distinguishing between the unprotected area of commercial fraud and protected speech is so similar to that of drawing the line between unprotected obscenity and protected speech that the safeguards employed in the latter determination by the *Rizzi* opinion must be brought over and applied to the procedure here under consideration.

Plaintiff seems to assume that what he calls "First Amendment safeguards" are always the same, whether the area involved is politics, religion, obscenity, commercial fraud or what not else. We think the safeguards defined in Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971), for obscenity cases are wholly inappropriate, unnecessary and inapplicable to the field of commercial fraud.

One does not have to be a student of anthropology, sociology, psychiatry or physiology to be aware of the fact that from the earliest times the human race has been preoccupied with sex. Despite Milton's eloquent plea in his Areopagiti-ca in 1644 there have been intermittent and more or less ineffective waves of censorship against what the censors are pleased to call "obscenity."

If the discoveries of Galileo and other scientists are facts of which the human race should be informed, it would seem that facts or what some people say are facts about sex should not be kept hidden and under wraps. True it is that the Supreme Court held in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), that obscenity is not protected by the First Amendment. But, what is obscenity? We have had in the last decade numerous and at times lengthy descriptions in majority, plurality, concurring and dissenting opinions but still the decisions of lower courts, with or without the assistance of jury verdicts, are not infrequently overturned because of mistaken views on the subject of what is and what is not obscene.

It is this "finely drawn line" of demarcation that led to Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and to Blount v. Rizzi, *supra*. If the unprotected area seems to grow smaller and smaller this must be because the protected area is deemed of importance to society at large and, if this protected area is to be preserved intact against the urgent demands of over-zealous censors, strong measures are required. And these are the safeguards so clearly defined in Blount v. Rizzi—prompt and final judicial review on the issue of obscenity, before restraint, on the Government's initiative, and with the burden of persuasion on the Government to prove that what has been portrayed in one form or another is obscene and hence not protected by the First Amendment. It is in the drawing of the distinction between what is not obscene and what is obscene, between

Office and Civil Service, 90th Cong., 1st Sess. (1967) ; S.Rep. No. 886, 90th Cong., 1st Sess. (1967) ; Hearings on S. 274 Before the Subcommittee on Postal Affairs of the Senate Committee on Post Office and Civil Service, 90th Cong., 1st Sess. (1967).

the protected and the unprotected matter, that the use of "sensitive tools" is made mandatory.

How different is all this from the ascertainment of a commercial fraud, a scheme to defraud the public by the use of false representations! It may not be easy to resolve factual issues in an occasional complicated case involving conflicting testimony, but the ultimate finding of true or false is arrived at by the use of the plain and simple tools affecting credibility and the weighing of the proofs that have been traditionally used since a time to which the memory of man runneth not to the contrary. A hearing examiner, whether serving in the Post Office Department or in effecting the procedures of the Federal Trade Commission, will know how to handle these tools. A scheme to defraud by false representations can be objectively proved by evidence in an administrative hearing without going through the delay of a trial before a judge. Good old-fashioned schemes to defraud by the use of false representations are as old as the hills, and as easily recognized once the issues of credibility have been resolved. So we conclude that this case is distinguishable from Blount v. Rizzi, *supra.*

With respect to plaintiff's argument on overbreadth and chilling we think it is a sufficient answer to say that the Postmaster General has never sought a stop order in any case where a politician was seeking campaign contributions, or a Church or religious body has issued appeals for charity. We doubt that any politician, religious group or legitimate businessman has or will feel threatened by the authority granted to the Postmaster General by the provisions of Section 3005.

We hold the claim of unconstitutionality must be rejected *in toto*. The petition for a temporary or permanent injunction is denied.