M.K.S. ENTERPRISES, INC. and/or Growing Glory and/or Pro–B–5 and Pro–B–5 Division, Plaintiff,

v.

UNITED STATES POSTAL SERVICE, Postmaster, Westbury, New York 11590, Postmaster, New York, New York 10010, Defendants.

No. 77 C 1448.

United States District Court, E. D. New York.

July 21, 1978.

Weiss, Rothfarb & Chernofsky, New York City, for plaintiff by Charles B. Chernofsky, New York City.

David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N.Y., for defendants by Ralph L. McMurry, Asst. U. S. Atty., Brooklyn, N.Y.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

This is an action brought to enjoin defendants from enforcing a "mail stop" order issued following an administrative determination that plaintiff was engaged in conducting a scheme or device for obtaining money or property through the mails by means of false representations, in violation

of 39 U.S.C. § 3005(a). Plaintiff now moves for summary judgment in its favor, pursuant to Rule 56, F.R.Civ.P., contending that the Postal Service determination is not supported by substantial evidence in the administrative record and that it is now as a matter of law entitled to a judgment permanently enjoining enforcement of the mail stop order. The parties agree that there is no issue as to any material fact.[1]

Plaintiff M.K.S. Enterprises, Inc. ("M.K.S.") is the manufacturer of Growing Glory Lotion ("Growing Glory") and Pro-Vitamin B 5 d-panthenol Lotion ("Pro–B–5"), two hair care preparations which it advertises in periodicals of general circulation and markets through the mails. The products are of identical composition and consist of perfume, germicidal agents, a coloring agent, a solubalizing agent, and two "active" ingredients, Wilson WSP–X250 protein (a commercially produced derived protein of relatively small molecular weight and size), and the vitamin d-panthenol (the alcohol analog of pantothenic acid, vitamin $B_5$).

On January 14, 1977, the Postal Service filed an administrative complaint charging that plaintiff in its advertising had made materially false representations about its products Pro–B–5 and Growing Glory. Specifically, the Postal Service alleged that the advertisements falsely represent that Pro–B–5 and Growing Glory if correctly applied will (1) "cause the user to have thicker, stronger, and longer hair"; (2) cause "the hair to grow longer and become stronger because [the product] is absorbed into the individual hair strands and permanently affects their structure"; (3) "pro-duce the promised results within one week"; (4) "repair hair damaged by 'chemicals, brushing, teasing, bleaching . . .' and heal split ends"; and (5) "cause the user to have thick, long hair such as that of the model pictured in the advertisement[s]." See USPS Complaint, Docket No. 5/121 (filed 1/14/77). ¶¶ 3–4. Plaintiff in its answer conceded that the advertisements in question had been published at its direction, but denied all other allegations of the complaint.

On March 1, 1977, an evidentiary hearing was conducted before an administrative law judge who, on April 20, 1977, rendered an initial decision in favor of the Postal Service. The administrative law judge concluded that plaintiff's advertisements together make all of the representations alleged in the complaint and make materially false representations that Pro–B–5 and Growing Glory will (1) cause the user's hair to grow longer; (2) heal split ends; and (3) cause the user to have long hair like that of the model pictured in the advertisements. He did, however, find that there was proof "that the products will help to bring split ends together," Init.Dec. (4/20/77) at 11, and that there was in the record

"substantial evidence that the products will cause the user to have thicker and stronger hair; that it will permanently affect the structure of the hair; that the products will produce thickening and strengthening of the hair within one week; and that they will repair hair damaged by chemicals, brushing, teasing and bleaching." Id. at 12.[2]

---

1. A certified copy of the administrative record, including the transcript of the March 1, 1977, administrative hearing, was submitted to and considered by the court in conjunction with plaintiff's motion for preliminary relief and defendants' cross-motion for summary judgment. Resubmission for purposes of this motion is therefore unnecessary. See Rule 65(a)(2), F.R. Civ.P.; 7 Moore's Fed.Practice '. 65.04[5] (1972).

2. None of the witnesses who testified at the administrative hearing had performed laboratory tests on either product. Dr. Vincent F. Cordaro, a Food and Drug Administration physi-cian assigned as medical liaison between the FDA and the Postal Service, was the sole witness called by the Postal Service. Dr. Cordaro testified that human hair, a "dead" extrusion of the hair follicle, cannot be strengthened, thickened or made to grow by any topically applied substance, although a protein formula so applied might produce an "illusion of thickness." Hrg.Tr. (3/1/77), at 7–10. Dr. Cordaro further testified that he had never conducted scientific tests on the effects of topical applications to the hair, but based his opinions on texts on dermatology, cosmetics and chemistry, the titles and authors of which he could not recall. Id. at 14–16.

On appeal, the initial decision was affirmed, with slight modification, by a Postal Service judicial officer. Specifically, the judicial officer affirmed all but one of the findings of the initial decision, reversing only the determination that the Pro–B–5 advertisement (in contrast to that for Growing Glory) represents that that product will "heal" split ends. Postal Service Decision (6/21/77). Accordingly, a mail stop order (United States Postal Service Order No. 77–30 (6/21/77)) was issued, directing the postmasters of Westbury, N.Y. and New York, N.Y. to withhold delivery to plaintiff of mail relating to sales of Pro–B–5 and Growing Glory and to return all such mail to the senders, and to stop payment of postal money orders payable to plaintiff for purchases of these products. In order to afford plaintiff an opportunity to seek judicial review, the Postal Service on June 24, 1977, temporarily stayed so much of the stop order as required return of mail to senders and advice to remitters of postal money orders concerning refunds.

On July 13, 1977, this court granted plaintiff's application for an order temporarily restraining the enforcement of the Postal Service mail stop order, and directed defendants to show cause why a preliminary injunction should not issue. After hearing counsel for the parties, the court on August 3, 1977, denied defendants' motion for summary judgment and granted plaintiff's application for a preliminary injunction. Defendants originally sought to appeal from so much of this order as granted preliminary injunctive relief; their appeal was,

however, withdrawn by stipulation in November 1977.

Title 39 U.S.C. § 3005(a) authorizes the Postal Service to issue mail stop orders "[u]pon evidence satisfactory to [it] that any person is engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations . . . ." The scope of this court's power to review such decisions of the Postal Service is governed by 5 U.S.C. § 705, and is confined "to determining whether there is, considering the record as a whole, substantial evidence to support [the Judicial Officer's] findings of fact, and whether he has committed errors of law." *Baslee Products Corp. v. United States Postal Service*, 356 F.Supp. 841, 844 (D.N.J.1973). See *Vibra Brush Corp. v. Schaffer*, 152 F.Supp. 461, 463–64 (S.D.N.Y. 1957), *order vacated on other grounds*, 256 F.2d 681 (2 Cir. 1958). Indeed, at least one court has formulated the standard of judicial review in terms recalling the test formulated by the Supreme Court nearly a half-century prior to the adoption of the Administrative Procedure Act, holding that "[t]he power . . . vested in the Postal Service [by 39 U.S.C. § 3005] may not be interfered with by the courts unless it has exceeded its authority or is palpably wrong." *N. Van Dyne Advertising Agency, Inc. v. United States Postal Service*, 371 F.Supp. 1373, 1375 (S.D.N.Y.1974) (citing *Public Clearing House v. Coyne*, 194 U.S. 497, 509, 24 S.Ct. 789, 48 L.Ed. 1092 (1904)), followed in *Unique Ideas, Inc. v. United*

---

Plaintiff called two witnesses. Irwin Thaler, a cosmetic chemist and executive president of M.K.S., testified that he had developed his product on the basis of literature published by Hoffmann-La Roche Inc. and Wilson Pharmaceutical and Chemical Corp., the manufacturers of d-panthenol and WSP–X250 protein, respectively. See Hrg.Exhs. RX–1, RX–2. Mr. Thaler's testimony was based largely on his familiarity with this literature, although he indicated that during the course of his career as a research and development and production chemist for a number of cosmetic and pharmaceutical firms he "had started to do some work with d-panthenol and protein." Hrg.Tr., *supra*, at 46.

Plaintiff's other witness was Stanley Scharf, a cosmetic chemist with many years experience in product research and development, currently employed by Estee Lauder. Mr. Scharf apparently had not performed tests on either Pro–B–5 or Growing Glory, but he was the only witness who claimed to have participated in laboratory studies of the effects of the active ingredients of both products. See Hrg.Tr., *supra*, at 61–62.

The court, of course, offers no view concerning the weight to be accorded the testimony of the respective witnesses.

*States Postal Service,* 416 F.Supp. 1142, 1144 (S.D.N.Y.1976). See *Vibra Brush Corp. v. Schaffer, supra,* 152 F.Supp. at 463–64; see also *Bates & Guild Co. v. Payne,* 194 U.S. 106, 24 S.Ct. 595, 48 L.Ed. 894 (1904); *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902). Hence,

> "even though the court, as the original trier of the facts, might have reached a different conclusion, it may not substitute its own judgment if there is substantial evidence to support the findings of fact made by the [Postal Service]. . . [T]he court's power to upset a finding by the [Postal Service] that the mails are being used in furtherance of a fraudulent scheme is restricted to those instances where there is no substantial evidence reasonably to support [its] conclusion."

*Vibra Brush Corp. v. Schaffer, supra,* 152 F.Supp. at 463–64 (footnotes omitted), quoted in *Unique Ideas, Inc. v. United States Postal Service, supra,* 416 F.Supp. at 1144, and *N. Van Dyne Advertising Agency, Inc. v. United States Postal Service, supra,* 371 F.Supp. at 1375–76.

Prior to amendment in 1968, the immediate predecessor of § 3005, 39 U.S.C. § 4005,[3] authorized the Postmaster General to issue mail stop orders upon a showing that "any person is engaged in conducting a scheme or device for obtaining money or property through the mail by means of *false or fraudulent pretenses, representations, or promises* . . . ." The 1968 amendment, see Pub.L. No. 90–590, 82 Stat. 1153 (1968), substituted for the emphasized language the phrase "false representations," and was intended to eliminate the requirement of proof of scienter or intent to defraud, which had emerged from a number of Supreme Court decisions interpreting former §§ 259 and 732 of Title 39 (the

forerunners of § 4005),[4] and similar regulatory statutes, most notably *Reilly v. Pinkus,* 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63 (1949), and *Seven Cases v. United States,* 239 U.S. 510, 36 S.Ct. 190, 60 L.Ed. 411 (1916). See *United States v. International Term Papers, Inc.,* 477 F.2d 1277, 1280 (1 Cir. 1973); *Lynch v. Blount,* 330 F.Supp. 689, 692–95 (S.D.N.Y.1971) (three-judge court), *aff'd,* 404 U.S. 1007, 92 S.Ct. 673, 30 L.Ed.2d 656 (1972); H.R.Rep. No. 235, 90th Cong., 2d Sess. (1967), reprinted in 1968 U.S.Code Cong. & Admin.News at 4290–4302. Hence, a reviewing court will not set aside a Postal Service mail stop order where there is substantial evidence in the administrative record to support the agency's determination that an advertiser has employed false material representations in order to generate sales of its products through the mails. See *Peak Laboratories, Inc. v. United States Postal Service,* 556 F.2d 1387, 1389 (5 Cir. 1977); *Unique Ideas, Inc. v. United States Postal Service, supra,* 416 F.Supp. at 1145; *United States v. International Term Papers, Inc., supra,* 477 F.2d at 1279; *N. Van Dyne Advertising Agency v. United States Postal Service, supra,* 371 F.Supp. at 1375.

As noted above, the mail stop order challenged by plaintiff was issued on the basis of a Postal Service determination that the advertisements for Pro–B–5 and Growing Glory contain a number of false material representations. Specifically, the agency found that the advertisements for both products falsely represent that the products will cause hair to grow longer and will cause the user to have long hair like that of the model pictured in the advertisements, and that the advertisements for Growing Glory falsely represent that it will heal split ends. Although plaintiff appears to argue that even if made, the foregoing representations have not been shown to be material-

---

3. This renumbering was the product of the Postal Reorganization Act of 1970, Pub.L. No. 91 375, 84 Stat. 719, which carried forward the language of the provision as amended in 1968 with only slight modification.

4. In 1960, Congress consolidated the mail-stop and stop-payment provisions of former §§ 259 and 732 into a single statute, 39 U.S.C. § 4005, without any substantive change in the law. See Act of September 2, 1960, Pub.L. No. 86–682, 72 Stat. 654.

ly false, it is sufficient, in view of the agency's finding that both products yield certain beneficial results, to consider only plaintiff's contention that the Postal Service's determination of the representations made is not supported by substantial evidence.

As the Supreme Court has observed, advertisements are to be interpreted in terms of "the effect [they] would most probably produce on ordinary minds." *Donaldson v. Read Magazine*, 333 U.S. 178, 189, 68 S.Ct. 591, 597, 92 L.Ed. 628 (1948) (quoted in *Unique Ideas, Inc. v. United States Postal Service, supra*, 416 F.Supp. at 1145). Thus,

> "It is not each separate word or a clause here and there of an advertisement which determines its force, but the totality of its contents and the impression of the entire advertisement upon the general populace. . . . The ultimate impression upon the reader results not only from the total of what is stated but also from what is reasonably implied."

*Vibra Brush Corp. v. Schaffer, supra*, 152 F.Supp. at 465 (citations omitted). Indeed, the parties agree that, as Judge Knapp held in *American Image Corp. v. United States Postal Service*, 370 F.Supp. 964, 966 (S.D.N.Y.1974), "such advertisements are to be viewed not with a lawyer's eye to 'fine spun distinctions' but with an eye to their overall effect upon the average reader." See Plaintiff's Mem. (7/12/77), at 6; Defendants' Mem. (filed 7/21/77), at 12. See generally *P. Lorillard Co. v. Federal Trade Commission*, 186 F.2d 52, 58 (4 Cir. 1950); *Baslee Products Corp. v. United States Postal Service, supra*, 356 F.Supp. at 844–45.

This test is, however, more easily stated than applied, because it requires the agency or reviewing court to evaluate an advertisement not by hard logical analysis of its parts but by forming an impression of the whole, in an attempt to gauge the overall effect of the advertisement upon the largely undefined yet apparently naive and uncritical "ordinary" reader. Neither the literal accuracy nor the patent absurdity of particular claims made will preclude a finding of misrepresentation. As Justice Black, writing for the Supreme Court on two occasions, observed:

> "Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. This may be because things are omitted that should be said, or because advertisements are composed or purposefully printed in such a way as to mislead. That exceptionally acute and sophisticated readers might have been able by penetrating analysis to have deciphered the true nature of the contest's terms is not sufficient to bar findings of fraud by a fact-finding tribunal. . . . People have a right to assume that fraudulent advertising traps will not be laid to ensnare them . . . ."

*Donaldson v. Read Magazine, supra*, 333 U.S. at 188–89, 68 S.Ct. at 597 (citations omitted) (action to enjoin order issued pursuant to 39 U.S.C. §§ 259 and 732).

> "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting as well as the suspicious. The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of *caveat emptor* should not be relied upon to reward fraud and deception."

*Federal Trade Commission v. Standard Education*, 302 U.S. 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. 141 (1937) (action to review FTC cease and desist order issued pursuant to § 5 of the Federal Trade Commission Act). It is in view of the foregoing that we turn to the text of the advertisements and the agency's findings.

The advertisement for Pro–B–5 is the more detailed and comprehensive of the two (Hearing Exh. CX–2):

# LEADING PHARMACEUTICAL LABORATORY* PROVES NEW PROVITAMIN B-5 IS ACTUALLY ABSORBED INTO THE HAIR TO GIVE YOU

**$3.98**

# THICKER, HEALTHIER MORE MANAGEABLE STRONGER & LONGER HAIR!

*Hard to believe? Well, just look at these pictures made with a super power Scanning Electron Microscope by this leading laboratory. On the left is not ordinary dry hair, but real healthy hair soaked in water till it could absorb no more. On the right is the same hair with only a 5% solution D-Panthenol (provitamin B-5) applied. Notice how the diameter of hair increased to look and feel up to 21% thicker. This can happen to your hair.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

 

**Picture shows water treated hair on left compared to Provitamin B5 treated hair. Diameter has increased up to 10% making hair look good and feel 20% thicker**

**This picture shows what Provitamin B5 can do to repair damaged hair.**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

But there is much more to report. This famous laboratory has made a startling discovery Ordinary natural hair, contains vitamin B5 — about 30 millionths of a gram per gram of hair By consistent use of D-Panthenol (provitamin B-5) the B-5 content of hair can be increased almost 100 times!

#### Damaged Hair Repaired

What is the result? You can see it for yourself right on this page. Hair damaged by chemicals, brushing, teasing, bleaching and environmental pollution is repaired — not by coating the outside, but from within as nature does it. The result — your hair is thicker, smoother, stronger, with no unpleasant sticky or oily foreign substance clinging to the outside to destroy the look of natural beauty you had before waving, bleaching, drying, or teasing. What's more, the thickening, strengthening effect persists right through washing, combing and brushing, so day by day your hair grows longer, stronger, thicker, and more beautiful. Well, I can tell you our cosmetic chemists were amazed and delighted, but we were not completely satisfied We

added hair loving natural derived collagen protein that had proven its success with thousands of our customers

We have incorporated *new* D-Panthenol into what we think is the greatest, the best hair conditioner we have ever seen We call it Pro B-5 Conditioner Lotion.

**What "Pro B-5" Can Do For You**

*If you have any of these hair problems*

**Hard to Manage Hair**
**Overteased Hair Damaged Hair**
**Fragile Hair—Easily Broken**

then you owe it to yourself, your appearance, your self-esteem and confidence to try Pro B-5 Lotion at our risk (We will tell you below just how you can do it.) Daring Promise!

Just try "Pro B-5", vitamin protein formula for one week Use it as an after-shampoo rinse and a little each day as a hair dressing. You will notice the remarkable beautifying difference immediately and day by day the improvement will astonish you. If your hair is beautiful now it will become gorgeous If your hair is in any way damaged by air pollution, waving, bleaches, dyes, teasing—if it is thin, fragile, if it has split ends, you will marvel at the change. It will look thicker and feel thicker because it *is* thicker. Not coated on the outside, but expanded from the inside by having absorbed the vitamins and proteins it needs This is our promise. We make it with confidence because we have tried it and we know it will work.

But you risk nothing. "Pro B-5" formula must do everything we said it would, everything you expect of it or you will get back every cent you paid.

And the cost is little. Only $3.98 for a full 60 day supply of concentrated hair beauty that will last and last. So don't hesitate Order today The coupon below is for your convenience.

**\* NAME ON REQUEST**

---

**Pro B-5 div. Dept. 10674**
**210 Fifth Avenue. New York, N.Y. 10010**

Send me a generous 4 oz bottle of Pro B-5 hair beauty lotion on your money back guarantee stated above I must be delighted or I can return the bottle within 30 days and get a refund

I enclose $3 98 for a full 4 oz supply
Send me a double supply (8 oz ) for just $6 98 (you save $1) (Please include 25¢ for postage & handling with your order)
·Division MKS Inc

**MONEY BACK GUARANTEE**

Name _____

Address _____

City _____

State _____ Zip _____

The Growing Glory advertisement is considerably more concise (Hearing Exh. CX–4):

**THICKER, STRONGER LONGER HAIR IN 5 TO 10 DAYS!**

Scientific Laboratory Proof. New Protein Lotion is actually absorbed into the hair. to reinforce, strengthen and thicken it up to 136% of original size. Reduces splitting and breakage; makes hair more stretchable. Growing Glory is a concentrated treatment for the hair of specially formulated natural protein, designed to be absorbed right into the hair. The illustration shows how the hair is swelled and made thicker by Growing Glory.

But, only if you try it will you see how wonderfully different it is. Growing Glory's active protein is absorbed right into the shaft of the hair so day by day your hair grows visibly thicker, fuller, more combable. more manageable.more flexible and stronger. Split ends heal — your hair resists breaking when combed or brushed So it grows better and longer everyday! Pleasant — contains no alcohol or grease You owe it to the beauty of your hair to try Growing Glory. Our money back guarantee protects you Growing Glory must be better than any hair product you ever tried—must do everything we said it would do for you or we will cheerfully refund every cent you paid. Send just $3 95 for a generous two month sup ply. Please enclose 25¢ for postage and handling.

**GROWING GLORY° DEPT. 20984 50 Bond St., Westbury, N.Y. 11590** °Division MKS Inc.

In support of his conclusion that the advertisements represent that both products "will cause the hair to grow longer," Initial Decision (4/20/77) at 10, ¶ 2(c), the administrative law judge explained that:

"This representation is found particularly in the photographs of models with waist-length or longer hair and in the following wording:

" '* * * LONGER HAIR * * * So it grows better and longer everyday' (CX–2, Growing Glory)

" '* * * new provitamin B–5 is actually absorbed into the hair to give you * † * longer hair * * * ' "

*Id.* (ellipses in quoted text). Without more, the conclusion is ambiguous and not entirely in harmony with other findings of the Initial Decision. The administrative judge undoubtedly recognized this problem, conceding that "[a] close, analytical reading of the advertisements may lead one to the conclusion that the ads represent that the products will allow, rather than cause, growth." He held, however, that "the representation that the products cause growth is that which would most probably be found by ordinary minds." *Id.* This last is important not only because it reveals that in the administrative judge's view the question was a close one, but also because it indicates that he understood the advertisements to represent that the products will stimulate or accelerate natural growth processes.

Relying, apparently, on the same portions of the advertisements, the administrative law judge also concluded that the advertisements represent that the products will "cause the user to have . . . long hair such as that of the model pictured therein." Initial Decision, *supra*, at 11, ¶ 2(f). According to the administrative judge, "[t]his representation is found in the combination of the pictures and the promises as to growing and lengthening of the hair." *Id.*

Both determinations were affirmed on appeal by a Postal Service judicial officer. The judicial officer rejected without great elaboration plaintiff's contention that the advertisements would not convey to the ordinary reader the "impression" that either product "would cause hair to grow longer," noting simply that he agreed with the administrative law judge's analysis, and "[t]hat the general purport conveys this impression quite clearly." Postal Service Decision (6/21/77), at 3. He similarly disposed of plaintiff's exception to the finding that the advertisements represent that the user can expect to obtain long hair like that of the model: "[T]he most striking aspect of the advertisements is the length of the hair on the models. The picture must be considered an important part of the advertisement and when viewed with the entire context of the advertisement conveys the vivid inescapable impression of cause and effect." *Id.*

Plaintiff now argues, as it did before the judicial officer, that the administrative law judge impermissibly viewed the advertisements with the "lawyer's eye to fine spun distinctions." We agree. Where, as here, the allegedly false representations are not expressly stated, but are claimed to emerge from the interplay of the various parts of an advertisement, the advertisement must be assessed according to "the totality of its contents and the impression of the entire advertisement upon the general populace." *Vibra Brush Corp. v. Schaffer, supra,* 152 F.Supp. at 465. Thus, while there is in each advertisement language which in different contexts might support the agency's findings, when viewed as an integral part of each of *these* advertisements the same language yields a significantly different meaning. Just as an advertiser may not avoid the prohibitions of § 3005 by artfully assembling from true statements an advertisement that as a whole is misleading, the Postal Service cannot invoke its authority under this section unless the overall effect of an advertisement is to mislead the ordinary reader.

As plaintiff concedes, and as the administrative law judge found, "the advertisements represent that the correct application of the products will cause the user to have thicker, stronger, and longer hair." Initial Decision, *supra,* at 10, ¶ 2(a). Not only did the administrative judge fail to find this representation to be false, he further found that

> "There is substantial evidence that the products will cause the user to have thicker and stronger hair, that it will permanently affect the structure of the hair; that the products will produce thickening and strengthening of the hair within one week, and that they will repair hair damaged by chemicals, brushing, teasing and bleaching." *Id.* at 11, ¶ 3.

The advertisements, viewed in their entirety, are calculated to suggest no more, even to the credulous and unsophisticated reader. Indeed, even the most cursory reading would not lead to the effect perceived by the agency; the plain impression is that the products strengthen and repair damaged hair (and in the case of Growing Glory, reduce breakage), and thereby permit longer growth. The inclusion in each advertisement of a photograph emphasizing a young woman's extravagant tresses, although eye-catching, does not alter that impression. While such a photograph coupled with no more than a boldly set announcement on the order of "GROW LONGER HAIR" might be regarded as an independent representation or promise of performance, in the context of *these* advertisements, the photographs are hardly more than the sort of attractive embellishments typically associated with advertisements for cosmetic products and with which the ordinary reader is unavoidably familiar.

Finally, plaintiff takes issue with the agency's conclusion that the Growing Glory advertisement falsely represents that the product will "heal" so-called "split ends," the separated tips of individual hair shafts. Again, the dispute is largely semantic. Plaintiff concedes that its advertisement makes the claim that Growing Glory will "heal split ends," but argues that the finding of falsity is the result of the administrative law judge's improper reliance on "fine distinctions of the 'exceptionally acute or sophisticated' reader." Plaintiff's Mem., *supra,* at 11 (quoting from *Donaldson v. Read Magazine, supra* ). Defendants counter that the administrative judge did no more than apply a "commonly understood" definition of the verb "heal."

The administrative law judge offered this gloss on his finding of misrepresentation:

> "The proof is that the products will help to bring split ends together but there is no evidence that this is a true healing, healing being defined as making whole, curing, or restoring to original integrity."

Initial Decision, *supra,* at 11–12, ¶ 3(b) (citing Webster's Third New International Dictionary). In view of the evidence in the record and his own findings, the administrative judge was at pains to distinguish "heal" from "repair," holding that

"'[R]epair' is not synonymous with the term 'heal' as the latter is defined [in ¶ 3(b)]. Rather, the word repair means to put together what is torn or broken. Respondent's evidence shows that the products do repair damaged hair in that sense of the word."

*Id.* at 12, ¶ 4. As noted above, the finding that the Pro–B–5 advertisement contains a representation of "healing" was reversed on administrative appeal; the judicial officer, however, reached this result partly by endorsing the administrative law judge's found distinction between the terms "repair" and "heal." See Postal Service Decision, *supra*, at 3–4.

In support of the administrative decision, defendants urge that "[a] dictionary is a perfectly logical place to seek guidance as to the meaning of words." Defendants' Mem., *supra*, at 17. The observation, however accurate, falls somewhat short of the mark. As common sense and experience teach us, and as the dictionary entries for "heal" and "repair" well illustrate,[5] the meaning of a word depends greatly upon the context in which it is used. While a dictionary is useful in narrowing the range of meanings properly attributable to a particular word, it hardly ends the inquiry. No reader—no matter how "average" or "ordinary" his mind—can be expected to be wholly oblivious to the context in which the words he reads appear. Were this not so, the rule that requires integrated interpretation of advertising representations would make no sense.

Properly viewed—that is, "with an eye to the over-all effect upon the average read-er," *American Image Corporation v. United States Postal Service, supra*, 370 F.Supp. at 966—the advertisement cannot be said to represent (as defendants now argue[6]) that Growing Glory will organically regenerate split ends or permanently restore them to their original integrity. Rather, the advertisement suggests no more than that the product will alleviate the condition by causing the damaged ends to close or to be brought together. Having found that both products will actually repair and strengthen damaged hair and bring split ends together, the agency erred in concluding that this representation is materially false.

The court therefore is of opinion that the Postal Service determination that plaintiff's advertisements contained false material representations is not supported by substantial evidence in the record, and that the agency's issuance of United States Postal Service Order No. 77–30 constituted an abuse of discretion. Accordingly, plaintiff's motion for summary judgment enjoining enforcement of that order is granted.

Settle order on 10 days notice.

SO ORDERED.

---

5. Webster's Third New International Dictionary (unabridged ed. 1971) provides the following definitions for the verbs "heal" and "repair" (pronunciations, inflectional forms, etymological information and verbal illustrations have been omitted):

"heal . . . *vt* 1a: to make sound or whole: restore to health b: to cure of disease or affliction . . . 2a: to cause (an undesirable condition) to be overcome or eliminated: mend . . . *specif*: to patch up (a rift or division): cement . . . b: to re-store to original purity or integrity: to make (a person) spiritually whole: to restore from evil . . .—*vi* 1: to grow sound: return to a sound state . . . 2: to effect a cure."

"repair . . . *vt* 1a: to restore by replacing a part or putting together what is torn or broken: fix, mend . . . b: to restore to a sound or healthy state: renew, revivify . . . 2: to make good: remedy . . . 3: to make up for: compensate for . . .— *v.i*: to make reapirs."

6. See Defendants' Mem. (filed 6/21/77), at 17.