**UNITED STATES POSTAL SERVICE,
Plaintiff-Appellee,**

**v.**

**ATHENA PRODUCTS, LTD.,
Defendant-Appellant.**

**No. 81–7303.**

United States Court of Appeals,
Fifth Circuit.
Unit B

Aug. 27, 1981.

Rehearing and Rehearing En Banc Denied
Oct. 8, 1981.

Benham & Cohen, P. C., Tom Benham, Atlanta, Ga., for defendant-appellant.

Kathie G. McClure, Asst. U.S. Atty., Atlanta, Ga., for defendant-appellee.

Before HILL and VANCE, Circuit Judges, and LYNNE *, District Judge.

VANCE, Circuit Judge:

This case involves a challenge to the statutory scheme authorizing the United States Postal Service to prevent the obtaining of money through the mail by means of false representations. Appellant contends that the statutory provisions restrain advertising in a manner inconsistent with the protection afforded by the first amendment to commercial speech.

The congressional scheme is embodied in 39 U.S.C. § 3005 and 39 U.S.C. § 3007. Under section 3005 [1] the Postal Service may institute administrative proceedings to determine whether money is being obtained through the mails by means of false representations. If a violation of section 3005 is established, that section permits the postmaster to return to sender mail and money orders addressed to the violator. Section 3007 [2] enables the Postal Service to obtain an injunction in district court to detain the mail of an alleged violator during the pendency of administrative proceedings under section 3005. The statute specifies that an injunction be granted upon a showing of probable cause to believe that section 3005 is being violated.

In February 1981, after instituting administrative proceedings under section 3005, the Postal Service filed the present suit against Athena Products, Ltd. under section 3007. Athena Products sells "health" products through the mails. It solicits orders for these products through advertisements in its own bi-monthly magazine, *Soma*, and through other publications. Each issue of *Soma* contains an order blank to be mailed to the address advertised in that issue along with payment for the desired products. This suit concerns alleged misrepresentations regarding fifteen advertised products.

At the hearing in district court in March 1981, both parties presented affidavits and testimony from expert witnesses as to the truth of the claims made in the advertising for the fifteen products. In its careful review of the evidence, the district court divided the fifteen products into three gener-

---

* District Judge of the Northern District of Alabama, sitting by designation.

1. 39 U.S.C. § 3005(a) provides in pertinent part:

 Upon evidence satisfactory to the Postal Service that any person is engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations ... the Postal Service may issue an order which—

 (1) directs the postmaster of the post office at which mail arrives, addressed to such person or to his representative, to return such mail to the sender appropriately marked as in violation of this section, if the person, or his representative, is first notified and given reasonable opportunity to be present at the receiving post office to survey the mail before the postmaster returns the mail to the sender; and

 (2) forbids the payment by a postmaster to the person or his representative of any money order or postal note drawn to the order of either and provides for the return to the remitter of the sum named in the money order or postal note.

2. 39 U.S.C. § 3007(a) provides:

 In preparation for or during the pendency of proceedings under sections 3005 and 3006 of this title, the United States district court in the district in which the defendant receives his mail shall, upon application therefor by the Postal Service and upon a showing of probable cause to believe either section is being violated, enter a temporary restraining order and preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure directing the detention of the defendant's incoming mail by the postmaster pending the conclusion of the statutory proceedings and any appeal therefrom. The district court may provide in the order that the detained mail be open to examination by the defendant and such mail be delivered as is clearly not connected with the alleged unlawful activity. An action taken by a court hereunder does not affect or determine any fact at issue in the statutory proceedings.

al categories: those claimed to cause weight loss and figure modification,[3] those advertised primarily as rejuvenating agents,[4] and a third group of miscellaneous products.[5] The court concluded that the plaintiff had gone substantially beyond meeting its burden of showing that probable cause existed to believe that Athena's advertisements were "reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Outpost Development Corp.*, 369 F.Supp. 399, 402 (C.D.Calif.), *aff'd*, 414 U.S. 1105, 94 S.Ct. 832, 38 L.Ed.2d 733 (1973). Athena does not contend that we should overturn this determination.

In accordance with its findings, the district court issued an order directing the postmaster to detain all of Athena's incoming mail addressed to designated post office boxes and street addresses. The order also prohibited Athena from soliciting orders for the fifteen products to other post office boxes. The order provided that Athena could examine its mail and collect items unconnected with the alleged unlawful activities. Recognizing that Athena was "entitled to a speedy resolution of this matter by the USPS" the court limited the prelimi-

nary injunction to a period not to exceed 120 days.

On appeal, Athena pursues constitutional challenges rejected by the district court. Chief among these challenges is Athena's claim that the "chilling effect" of the statutory scheme upon its advertising infringes impermissibly upon its first amendment rights and those of the public. While no direct prohibition on speech is involved, Athena is obviously deterred from advertising products for which it cannot fill orders.

Athena relies heavily on the Supreme Court's opinion in *Blount v. Rizzi*, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) which struck down a statutory scheme virtually identical to that in this case enabling the postmaster to proceed against persons believed to be selling obscene materials through the mails. The Court held that the statutes did not possess the characteristics required by the decision in *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The scheme did not place the burden of initiating judicial review on the Postal Service; nor did it provide for prompt judicial review. Similarly, the statute authorizing detention of mail during the pendency of administrative pro-

---

3. An example of the weight-loss group is Cellulite TR3:

> The unique TR3 formula features niacin, a natural and highly effective vasodilator, that causes every blood vessel and capillary to open up and flush itself out with fresh, cleansing blood. When used in the special time-release formula, niacin can even open the tiny capillaries in your cellulite-choked tissues so that your blood can remove accumulated wastes and also prevent their build-up. And, to assist in cleaning out the debris, Cellulite TR3 contains herbal diuretics that enable your body to quickly eliminate toxins while preventing the water retention that aggravates cellulite.
> R. 143.

4. An example of the rejuvenating group is RNA:

> Don't let your body grow old before it's time. RNA helps slow the aging process before it stops you from enjoying life .... The effects from RNA therapy seem almost miraculous. But when you consider that properly functioning RNA can essentially hold back the hands of time to keep you young and

energetic, you can see why supplemental RNA can have such a tremendous impact.
> R. 58.

5. The district court described this third group as follows:

> These products primarily provide vitamin and mineral supplements. Defendant expressly claims that these products will "help you improve your sexual performance and confidence" (Euzinc-D), "prevent the corrosive effects of oxidation from weakening your heart, muscles and other vital organs" (Ex-Sel), "improve your memory, thinking and concentration" and "measurably raise intelligence" (Food for Thought), "minimize the damaging effects of pollution on your looks and health" (Meta-E), cure "tension-caused sleeplessness and chronic insomnia" (Natural Calm), "prevent fatigue, facial pallor and brittle, dull fingernails" and prevent "water retention," hormone imbalance," and "dry, cracked lips" (Athena Nutrition for Women), prevent deficiencies that "lead to hypoglycemia, hyperglycemia and diabetes" (Chromill-GTF), and give you "a fast burst of energy" (Power Tabs).

ceedings upon a showing of probable cause failed to meet the requirement that "[a]ny restraint imposed in advance of a final judicial determination on the merits must . . . be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial discretion." *Blount v. Rizzi*, 400 U.S. at 421, 91 S.Ct. at 430 (quoting *Freedman v. Maryland*, 380 U.S. at 59, 85 S.Ct. at 739).

Subsequent to the decision in *Blount v. Rizzi*, however, the Supreme Court twice upheld the validity of the statutes at issue in this case. In *Lynch v. Blount*, 404 U.S. 1007, 92 S.Ct. 673, 30 L.Ed.2d 656 (1972), *aff'g* 330 F.Supp. 689 (S.D.N.Y.1971) the Supreme Court affirmed the opinion of a three judge court holding that "the safeguards defined in *Blount v. Rizzi* [citation omitted] for obscenity cases are wholly inappropriate, unnecessary and inapplicable to the field of commercial fraud." 330 F.Supp. at 694. The principal distinction drawn by the lower court in reaching its judgment was that unlike obscenity, "[a] scheme to defraud by false representations can be objectively proved by evidence in an administrative hearing without going through the delay of a trial before a judge. Good old-fashioned schemes to defraud by the use of false representations are as old as the hills, and as easily recognized once the issues of credibility have been resolved." 330 F.Supp. at 695. The court also drew support from Supreme Court decisions upholding legislation authorizing the Postal Service to investigate commercial frauds and to issue stop orders. *Id.* at 692 (citing *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 68 S.Ct. 591, 92 L.Ed. 628 (1948); *Public Clearing House v. Coyne*, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092 (1904)). *Lynch v. Blount* involved only section 3005. The following year, however, the Supreme Court upheld the constitutionality of section 3007 as well in *United States v. Outpost Development Corp.*, 414 U.S. 1105, 94 S.Ct. 832, 38 L.Ed.2d 733 (1973), *aff'g* 369 F.Supp. 399 (C.D.Calif.1973). *Accord, United States Postal Service v. Beamish*, 466 F.2d 804 (3d Cir. 1972).

This considerable body of precedent is not dispositive of the present case, however, since it predates the Court's holding in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) that unwarranted governmental regulation of commercial speech infringes upon the first amendment rights of both speaker and listener. The present case thus poses the question whether *Lynch v. Blount* and *United States v. Outpost Development Corp.* survive *Virginia Board* and subsequent cases, or whether *Blount v. Rizzi* is now applicable even where only commercial speech is restrained.

In *Virginia Board* the Court made clear that it did not intend by its decision to impair the government's ability to regulate misleading or deceptive speech. "Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive and misleading. We foresee no obstacle to a State's dealing effectively with this problem." 425 U.S. at 771, 96 S.Ct. at 1830. The Court went on to note that "[t]here are commonsense differences between speech that does 'no. more than propose a commercial transaction' . . . and other varieties. Even if the differences do not justify the conclusion that commercial speech is valueless, and thus subject to complete suppression by the State, they nonetheless suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired." *Id.* at 771 n.24, 96 S.Ct. at 1830 (citation omitted). The differences noted by the Court were primarily practical. The truth of commercial speech may be more easily verified by its disseminator than in the case of news reporting or political commentary. Moreover, the chilling effect of government regulation would be mitigated by the urgency of the profit motive. *Id.*

 In his concurring opinion, Justice Stewart drew more fundamental distinctions contrasting commercial speech with "ideological expression." Ideological expression "is integrally related to the exposi-

tion of thought—thought that may shape our concepts of the whole universe of man." *Id.* at 779, 96 S.Ct. at 1834. The truth or falsity of any information contained in such speech is irrelevant in according first amendment protection. In contrast, commercial speech is valued only because of the information conveyed, "rather than because of any direct contribution to the interchange of ideas." *Id.* at 780, 96 S.Ct. at 1835. Thus government measures to insure accuracy are appropriate in the context of commercial speech although they would be repugnant elsewhere.

In the years since *Virginia Board* the Court has repeatedly emphasized that its decisions offer commercial speech only "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression." *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978). *Accord, Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 562–63, 100 S.Ct. 2343, 2349–2350, 65 L.Ed.2d 341 (1980); *Friedman v. Rogers*, 440 U.S. 1, 10, 99 S.Ct. 887, 894, 59 L.Ed.2d 100 (1979); *Bates v. State Bar of Arizona*, 433 U.S. 350, 380–81, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977).[6]

█ The care with which the Court has distinguished commercial from noncommercial speech indicates that its decisions upholding the constitutionality of sections 3005 and 3007 retain their vitality. The Court's clear concern to permit effective regulation of deceptive advertising and its suggestion that the prohibition against prior restraints may be inapplicable where commercial speech is concerned, *Virginia Board*, 425 U.S. at 771 n.24, 96 S.Ct. at 1830, negate any suggestion that prompt judicial review initiated by the censor is required whenever the government undertakes to regulate misleading advertising. This judg-

ment reflects not only the "subordinate position in the scale of First Amendment values" allotted to commercial speech, *Ohralik*, 436 U.S. at 456, 98 S.Ct. at 1918, but the comparative difficulties inherent in determining obscenity and misleading advertisement noted by the court in *Lynch v. Blount.* We conclude therefore that the decision in *Lynch v. Blount* upholding section 3005 remains good law. *Accord, Original Cosmetics Products, Inc. v. Strachan*, 459 F.Supp. 496 (S.D.N.Y.1978), *aff'd* 603 F.2d 214 (2d Cir.), *cert. denied* 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 170 (1979).

█ Of greater concern is the ability of the Postal Service under section 3007 to obtain an injunction detaining defendant's mail upon a showing of probable cause. The Court has indicated that the legislature is to be accorded considerable deference in regulation of misleading advertising even to the extent of permitting prior restraints. A section 3007 injunction therefore does not appear to trench upon first amendment values. Even though such an injunction may occasionally restrain accurate commercial speech for a period, the restraint is only temporary and the procedures provided insure against baseless government censorship. Counsel for Athena points out, however, that an injunction issued under section 3007 may last for the duration of administrative proceedings under section 3005, and that these proceedings may extend over a protracted period. While the government may restrain commercial speech prior to a final determination on the merits in a manner that would be unconstitutional where noncommercial speech is concerned, the first amendment protects against erroneously imposed prior restraints of excessive duration even in the area of commercial speech. *See Space Age Products, Inc. v. Gilliam*, 488 F.Supp. 775, 784 (D.Del.1980). Injunctions granted under section 3007 should therefore extend no longer than necessary for a prompt administrative determination on the merits conducted in the sec-

**6.** For a concise analysis of the characteristics distinguishing commercial speech from speech protected under traditional first amendment theories see Jackson & Jeffries, *Commercial Speech: Economic Due Process and the First Amendment*, 65 Va.L.Rev. 1 (1979).

tion 3005 proceeding. The district court met this requirement, noting that Athena was entitled to a speedy resolution in the administrative hearing, and carefully limiting the preliminary injunction to a period not to exceed 120 days.

Athena alleges that section 3007 reaches too broadly because it requires it to sort through all its mail and demonstrate which items are unrelated to the alleged deceptive advertising. Relying on *Central Hudson Gas*, 447 U.S. at 565–66, 100 S.Ct. at 2350–51, it asserts that the burden is on the government to demonstrate that its objective could not be more narrowly achieved. In *Central Hudson Gas*, the Court stated that whether a government regulation is more extensive than necessary only becomes a relevant question once it has been determined that the speech is not misleading. *Id.* at 563–64, 100 S.Ct. at 2350. The Court carefully avoided extending safeguards applicable to noncommercial speech to the regulation of misleading advertising. *Id.* at 566, 100 S.Ct. at 2351. *But see Beneficial Corp. v. FTC*, 542 F.2d 611, 620 (3d Cir. 1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977) ("[A] remedy, even for deceptive advertising, can go no further than is necessary for the elimination of the deception.").

■ Athena argues almost in passing that the detention of its mail upon a showing of probable cause does not afford it due process of law.[7] In determining whether section 3007 provides adequate procedural protection, we must examine the competing interests asserted by the two parties and the risk of erroneous deprivation inherent in the procedures used. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903,

47 L.Ed.2d 18 (1976). The effect of an injunction of this kind upon a mail order house may be considerable. Athena is prevented from conducting business in the fifteen products at issue for its duration. These products constitute a substantial portion of the company's business. Because customer orders remain inexplicably unfilled, the injunction may result in consumer disaffection. On the other hand, the government asserts an important interest, identified by Congress, in protecting the public from the type of deception alleged in this case. Our inquiry thus focuses upon the risk of erroneous deprivation. In the course of the hearing before a federal judge, both parties presented considerable expert evidence. Several briefs were submitted. The detailed opinion of the district judge reflects the care with which argument and evidence were analyzed. Despite the fact the court assessed the evidence against a standard of probable cause, the hearing afforded in this case minimized the risk of an erroneous deprivation while accomplishing the important goal of preventing the perpetration of an allegedly fraudulent scheme prior to the final administrative decision on the merits. Accordingly, we conclude that the requirements of due process have been met. We do not wish, however, to understate the potential adverse effects of this kind of order for Athena or future defendants in similar cases. These defendants are entitled to prompt administrative resolutions of their cases. Accordingly, as we have already held on first amendment grounds, injunctions granted under section 3007 should not extend longer than necessary for a prompt administrative determination.[8]

---

7. Precisely what constitutes a showing of probable cause under § 3007 is unclear. Our researches into the legislative history have not disclosed anything bearing on the question. As a practical matter, however, the district court appears to have operated in much the same way as if it were evaluating an attempt to show "probable success on the merits" in the usual preliminary injunction hearing. Other courts behave similarly. *See, e. g., United States Postal Service v. Oriental Nurseries*, 491 F.Supp. 1265 (S.D.Fla.1980).

8. Although it involves obvious differences, the Supreme Court's decision in *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) is instructive in our due process analysis. In *Barchi*, a race horse trainer complained that he had been deprived of due process when his license was suspended without either a pre-suspension or a prompt postsuspension hearing. The Court held that "the State is entitled to impose an interim suspension, pending a prompt judicial or administrative hearing that would definitely determine the issues, whenev-

Finally, Athena contends that it was given an insufficient time to prepare its defense and was denied due process as a result. This contention is without merit. Compare the facts of the present case with *Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc.,* 446 F.2d 353 (5th Cir. 1971).

The order issued by the district court in this case conforms to the requirements of the first amendment and due process. Accordingly, it is affirmed.

AFFIRMED.

er it has satisfactorily established probable cause to believe [the existence of trainer misconduct]." 443 U.S. at 64, 99 S.Ct. at 2649. The Court made clear, however, that any "appreciable delay in going forward with a full hearing" following the suspension would violate due process. *Id.* at 66, 99 S.Ct. at 2650. The interest of the trainer was comparable to that of Athena. As described by the three judge court in the *Barchi* case, "[t]he private interest at stake is, simply, the right to a livelihood. Plaintiff has convincingly demonstrated that a trainer, once his license is suspended, rightly or wrongly, is potentially subject to a loss of clients and an irretrievable loss of income from any race meeting in progress." *Barchi v. Sarafan,* 436 F.Supp. 775, 781 (S.D.N.Y.1977). The interest of the Postal Service in the present case is at least as strong as that of the state's interest in *Barchi* in maintaining the integrity of racing. The procedural protection provided in the present case is significantly greater than that afforded in *Barchi* since probable cause was determined after a full adversary hearing. In *Barchi* the trainer's license was suspended on the basis of an untested report by a single expert which the trainer was not given an opportunity to challenge.